KOOS et al., Appellants,

v.

CENTRAL OHIO CELLULAR, INC., f.k.a. Cellwave, Inc., et al., Appellees.

[Cite as *Koos v. Cent. Ohio Cellular, Inc.* (1994), 94 Ohio App.3d 579.]

Court of Appeals of Ohio,
Cuyahoga County.

Nos. 65121, 65838.

Decided May 31, 1994.

580

582

*Marshman, Snyder, Berkeley & Kapp* and *William F. Snyder,* for appellants.

*Kohrman, Jackson & Krantz* and *Jonathan M. Yarger; Burke, Kainski & Van Buren, James F. Burke, Jr., Dale F. Kainski* and *Susan K. Van Buren; Weston, Hurd, Fallon, Paisley & Howley* and *John J. Horrigan,* for appellees.

PORTER, Judge.

Plaintiffs-appellants Kenneth Koos, Brenda Koos, Michael Baglia and Carol Baglia appeal from summary judgment entered against them in their shareholder derivative suit (Civ.R. 23.1) against the defendants-appellees Cellwave, Inc. (n.k.a. Central Ohio Cellular, Inc.) and ten other shareholders of Cellwave, a closely held Ohio corporation. Plaintiffs' sole assignment of error asserts that the lower court erred in granting summary judgment because there were genuine issues of material fact precluding judgment as a matter of law. For the reasons hereinafter stated, we find no merit to appeal No. 65121 and affirm the judgment below. However, we do find merit to appeal No. 65838 and reverse and remand.

Cellwave was incorporated on September 26, 1988. In 1989, Cellwave participated in lotteries conducted by the Federal Communications Commission ("FCC") to randomly award licenses for the operation of cellular telecommunications systems in specified areas throughout the United States. Cellwave won two FCC licenses which permitted it to operate systems in Ohio–6 (six rural Ohio counties) and Michigan–9 (five rural Michigan counties). Under the licenses, Cellwave was required to meet construction deadlines of February 13, 1992 (for Ohio–6) and February 18, 1992 (for Michigan–9) or lose the franchises. In November 1991, these licenses were the only assets of Cellwave, which had a capitalization of $158,000 at that time.

In February 1991, the defendant shareholders filed a securities fraud suit against Cellwave's original promoter (Thomas Rawlings), and its then-majority shareholder (William Thompson). *Horrigan v. Thompson* N.D.Ohio No. 5:91 CV 0253 ("the Thompson case"). The suit was settled on July 25, 1991 under the terms of a confidentiality order. As a result, Thompson was no longer a shareholder of Cellwave. Thompson's residual claims against Cellwave for allocating income from Michigan–9 have recently been addressed by this court. See *Thompson v. Cent. Ohio Cellular, Inc.* (1994), 93 Ohio App.3d 530, 639 N.E.2d 462.

The change of corporate control was not approved by the FCC until October 25, 1991. On November 2 and 16, 1991, shareholders meetings were held and attended by all the shareholders. The reconstituted board of directors presented a business plan to exploit the licenses and meet the looming FCC construction deadlines of February 1992. There was a discussion of the business plan which proposed a sale of Michigan–9, the sale of additional stock and necessity of borrowing sufficient funds to permit the building of Ohio–6. The Cellwave shareholders unanimously voted to approve the sale and transfer of the Michigan–9 license to a third party for $14 million upon assurances that most of the proceeds (after expenses) would be distributed to the shareholders pro rata. At

the March 7, 1992 meeting, the shareholders voted to distribute the proceeds as agreed. This was done and on March 12, 1992, the plaintiffs each received their proportionate distribution—$837,614.56 to Mr. and Mrs. Koos and the same amount to Mr. and Mrs. Baglia, each couple having made an original $10,000 investment. The remaining shareholders likewise shared in the distributions, which aggregated $12 million.

At the November 16 meeting the plaintiffs advised they would not pledge their stock, which would have helped the corporation obtain a loan to build Ohio–6 in accordance with the business plan. All the other shareholders were willing to pledge their stock for the loan. In order to induce the plaintiffs to pledge their stock along with the other shareholders, by letter dated November 26, 1991, Cellwave offered, *inter alia*, to make a loan to the plaintiffs.

However, on November 27, 1991, the plaintiffs outlined their "minimum demands" in a letter to Cellwave offering to (1) consent to Cellwave's borrowing "approximately six million" and (2) "pledge their shares of Cellwave stock," provided that Cellwave agree to "loan approximately $100,000 to Ken and Brenda Koos" to be repaid without interest from the proceeds of the Ohio project when sold and that Cellwave "sell the Ohio project to the highest bidder immediately upon its completion." Cellwave declined to meet these terms and continued with its financing plans for Ohio–6.

These plans were known to plaintiffs and were adopted at subsequent shareholders' meetings which plaintiffs did not attend. Having committed to the distribution of most of the Michigan–9 proceeds, the corporation was confronted with the necessity to borrow money or sell additional stock, or both, to construct Ohio–6.

To procure a $3 million loan from a financial institution, National Telecom Finance Corporation ("NTF"), the shareholders made a nonrecourse pledge of their stock to collateralize Cellwave's note. All shareholders, except plaintiffs, agreed to pledge their stock and did so in exchange for a stock pledge commitment fee of $8,000 per share. Plaintiffs were offered the same opportunity to pledge their stock and obtain the fee on the same terms, but declined to do so for personal reasons.

To raise an additional $3.8 million, the corporation authorized the issuance of fourteen new shares of stock made available to the existing fourteen shareholders at a price of $271,428.57 per share ($3,800,000 divided by fourteen). This would give shareholders the option to reinvest some of the Michigan–9 proceeds they received in return for additional stock. When plaintiffs failed to subscribe, two additional shares were authorized and the price of the shares was reduced to $237,500 ($3,800,000 divided by sixteen). Plaintiffs were given the right to avoid

dilution of their share interest by participating on a pro rata basis in the new stock issue, but declined to do so.

Cellwave is a public utility subject to the regulations and supervision of the Public Utilities Commission of Ohio ("PUCO"). It may not issue shares of stock or obtain loans without PUCO approval. PUCO authorized Cellwave "to issue 16 additional common capital shares with no par value to its current shareholders for a total consideration of $3,800,000."

Fees aggregating $600,000 were paid to defendants Horrigan and Burke for their work as officers and directors in selling Michigan–9 and procuring the financing and construction of Ohio–6. These fees were discussed and approved at relevant shareholders' meetings, of which plaintiffs had notice but didn't attend. Horrigan and Burke abstained from voting on their own compensation and left the room when the other shareholders approved their compensation at a February 8, 1992 shareholders' meeting.

An issue subsequently arose in which plaintiffs claimed that Cellwave withheld important financial information from its auditors, allegedly resulting in the filing of improper tax returns which threatened the Subchapter S status of the corporation. These alleged improprieties involved the allocation of the Michigan–9 income distribution received in 1992 to 1991 for tax purposes which placed a tax burden on former shareholder Thompson.

Plaintiffs' amended complaint alleged that the majority shareholders, directors and officers breached their fiduciary duties to the minority shareholders (the plaintiffs) and controlled the corporation to their own advantage to the exclusion of plaintiffs and for no legitimate business purpose. Specifically, plaintiffs claimed: (1) that the sale of Michigan–9 and distribution of the proceeds was to enable the defendants to settle the Thompson lawsuit and buy out his Cellwave shares; (2) that the distribution of $300,000 to defendants for "stock pledge commitment fees" was not proper; (3) that the sale of the sixteen new shares of Cellwave was below fair market value and to the exclusion of plaintiffs, thereby diluting their interests; (4) that the payment of $600,000 in compensation fees to Horrigan and Burke for "services" to the corporation was excessive and without benefit to the corporation; and (5) that the defendants withheld financial information from the tax auditor resulting in the filing of improper tax returns which would affect the corporation in the form of penalties and interest.

Defendants' answer denied these allegations. Defendants filed motions for summary judgment on June 25, 1992, with briefs, affidavits and numerous corporate documents and exhibits. On August 12, 1992, the trial court granted plaintiffs additional time to take discovery. Plaintiffs' opposition papers were filed on October 16, 1992. On January 27, 1993, the trial court granted summary

judgment in favor of all defendants, from which appeal No. 65121 proceeded. The trial court issued no opinion to explain its ruling.

Subsequent thereto, defendants filed a motion to tax costs against plaintiffs, which the trial court denied for lack of jurisdiction on the grounds that the underlying case was on appeal. Defendants timely appealed from that ruling in appeal No. 65838. Both appeals have been consolidated for hearing before this panel.

Plaintiffs' original appeal was filed under the accelerated docket procedure of this court, but was transferred *sua sponte* to the court's regular calendar under Loc.App.R. 25(4). We note in passing that this appeal is by its very nature unsuited for accelerated procedure because of the complex and numerous issues and the volume of record material that must be considered.

We will first address appeal No. 65121 after setting forth the appropriate standards for our review.

## STANDARDS FOR SUMMARY JUDGMENT

Under Civ.R. 56, summary judgment is proper when "(1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to the party against whom the motion for summary judgment is made." *State ex rel. Parsons v. Fleming* (1994), 68 Ohio St.3d 509, 511, 628 N.E.2d 1377, 1379; *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 471, 364 N.E.2d 267, 273. It is well settled that the party seeking summary judgment bears the burden of showing that no genuine issue of material fact exists for trial. *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 330, 106 S.Ct. 2548, 2556, 91 L.Ed.2d 265, 278; *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 115, 526 N.E.2d 798, 801. Doubts must be resolved in favor of the nonmoving party. *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 358–359, 604 N.E.2d 138, 139–140.

However, the nonmoving party must produce evidence on any issue for which that party bears the burden of production at trial. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 111, 570 N.E.2d 1095, 1099; *Celotex, supra,* 477 U.S. at 322–323, 106 S.Ct. at 2552, 91 L.Ed.2d at 272. In accordance with Civ.R. 56(E), "a nonmovant may not rest upon the mere allegations or denials of his pleadings, but must set forth specific facts showing there is a genuine issue for trial." *Chaney v. Clark Cty. Agricultural Soc.* (1993), 90 Ohio App.3d 421, 424, 629 N.E.2d 513, 515.

 This court reviews the lower court's granting of summary judgment *de novo*. *Brown v. Scioto Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153, 1157–1158 ("We review the judgment independently and without deference to the trial court's determination"). An appellate court reviewing the grant of summary judgment must follow the standards set forth in Civ.R. 56(C). "The reviewing court evaluates the record * * * in a light most favorable to the nonmoving party. * * * [T]he motion must be overruled if reasonable minds could find for the party opposing the motion." *Saunders v. McFaul* (1990), 71 Ohio App.3d 46, 50, 593 N.E.2d 24, 26; *Link v. Leadworks Corp.* (1992), 79 Ohio App.3d 735, 741, 607 N.E.2d 1140, 1144. With these standards in mind, we address plaintiffs' sole assignment of error.

"The lower court erred when it granted summary judgment when genuine issues of material fact existed and the moving parties were not entitled to judgment as a matter of law."

Plaintiffs claim that defendants breached their fiduciary duties as majority shareholders, directors and officers in making the various decisions regarding the financing of Ohio–6, in making distributions and awarding compensation, and in withholding information from the corporate auditors.

 "Generally, majority shareholders have a fiduciary duty to minority shareholders." *Crosby v. Beam* (1989), 47 Ohio St.3d 105, 108, 548 N.E.2d 217, 220; *Gigax v. Repka* (1992), 83 Ohio App.3d 615, 621, 615 N.E.2d 644, 648–649; *Estate of Schroer v. Stamco Supply* (1984), 19 Ohio App.3d 34, 36, 19 OBR 100, 102, 482 N.E.2d 975, 976–978. Because of the potential for abuse, the fiduciary duty is "heightened" when the corporation is a close corporation. *Crosby, supra,* 47 Ohio St.3d at 108, 548 N.E.2d at 220. This heightened fiduciary duty is breached when "control of the close corporation is utilized to prevent the minority from having an equal opportunity in the corporation." *Id.* at 109, 548 N.E.2d at 221; see, also, *Gigax, supra,* 83 Ohio App.3d at 621, 615 N.E.2d at 648–649; *Priebe v. O'Malley* (1993), 89 Ohio App.3d 8, 12, 623 N.E.2d 573, 575–576. These fiduciary duties *do not mean* that minority shareholders can frustrate the will of the majority simply by disagreeing over the course of corporate action. See *Bohannon v. Taylor* (1936), 52 Ohio App. 564, 569, 6 O.O. 482, 484, 4 N.E.2d 164, 166; 12 Ohio Jurisprudence 3d (1979), Business Relations, Sections 527, 529.

"When a person acquires shares in a corporation, he comes in to be ruled by the majority in interest, and as long as such majority acts within the scope of the powers conferred upon the corporation, the voice of the majority is the voice of the corporation and of all the shareholders." *Id.* at 190, Section 527.

Both the legislature and the courts have long since come to recognize "the rights of the majority to exercise control over the corporate affairs to which

ownership of their shares entitled them." *Armstrong v. Marathon Oil Co.* (1987), 32 Ohio St.3d 397, 402, 513 N.E.2d 776, 782.

A review of the record indicates that the defendants, as the controlling shareholders, did not breach their fiduciary duty, as they afforded plaintiffs the same opportunities of which the majority took advantage.

■■■ Plaintiffs have also sued some of the defendants in their capacity as directors and officers of Cellwave. "That the relation between the officers and directors and their corporation and its stockholders is one of trust as to all corporate matters is universally recognized. It is a fiduciary relation * * *." *Nienaber v. Katz* (1942), 69 Ohio App. 153, 158, 43 N.E.2d 322, 325; see, also, *Geygan v. Queen City Grain Co.* (1991), 71 Ohio App.3d 185, 191, 593 N.E.2d 328, 331; *Wing Leasing, Inc. v. M & B Aviation* (1988), 44 Ohio App.3d 178, 181, 542 N.E.2d 671, 675. Directors must perform their duties in good faith and in a manner they reasonably believe to be in the best interests of the corporation. *Apicella v. PAF Corp.* (1984), 17 Ohio App.3d 245, 247, 17 OBR 512, 514, 479 N.E.2d 315, 318. In Ohio, the duties of the director are codified in R.C. 1701.59(B), which states in pertinent part that "a director shall perform his duties as a director * * * in good faith, in a manner he reasonably believes to be in the best interests of the corporation, and with the care that an ordinary person in a like position would use under similar circumstances." In analyzing the directors' duty:

"Ohio courts adhere to the 'business judgment rule,' and will not inquire into the wisdom of actions taken by the directors in the absence of fraud, bad faith or abuse of discretion * * *. [T]he business judgment rule recognizes that many important decisions are made under circumstances of uncertainty, and it prevents courts from imposing liability on the basis of ex post judicial hindsight and lowers the volume of costly litigation challenging the directorial actions." *Radol v. Thomas* (C.A.6, 1985), 772 F.2d 244, 256.

■■■ In shareholder actions alleging the breach of fiduciary duties, "the general rule * * * [is] that directors carry the burden of showing that a transaction is fair only after the plaintiff has made a prima facie case showing that the directors have acted in bad faith or without the requisite objectivity." *Id.* at 257. The breach of duty must be proven by clear and convincing evidence pursuant to R.C. 1701.59(C)(1):

"(C) For purposes of division (B) of this section:

"(1) A director shall not be found to have violated his duties under division (B) of this section unless it is proved by clear and convincing evidence that the director has not acted in good faith, in a manner he reasonably believes to be in or not opposed to the best interests of the corporation, or with the care that an

ordinarily prudent person in a like position would use under similar circumstances, in any action brought against a director."

The protection of the business judgment rule can only be "claimed by disinterested directors." *Gries Sports Ent., Inc. v. Cleveland Browns Football Co.* (1986), 26 Ohio St.3d 15, 20, 26 OBR 12, 16, 496 N.E.2d 959, 964. "Disinterested directors" does not mean indifferent directors, or directors with no stake in the outcome. If that were so, shareholders could never be directors or officers. *Johnson v. Trueblood* (C.A.3, 1980), 629 F.2d 287, 292 ("by the very nature of corporate life, a director has a certain amount of self-interest in everything he does"); *Asarco, Inc. v. Court* (D.C.N.J.1985), 611 F.Supp. 468, 473 ("the fact that Asarco directors own stock * * * is not sufficient to deprive their decision of the benefit of the business judgment rule").

Disinterested directors are those who "neither appear on both sides of the transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Gries, supra,* 26 Ohio St.3d at 20, 26 OBR at 17, 496 N.E.2d at 964. The decisions of disinterested directors will not be disturbed if they can be attributed to any rational business purpose. *Id.* "The burden is on the party challenging the decision to establish facts rebutting the presumption" of good faith of directors invoked by the business judgment rule. *Id.*

If a director is not disinterested or has engaged in self-dealing, the decision is not void but will be closely scrutinized. *Apicella, supra,* 17 Ohio App.3d at 247, 17 OBR at 514, 479 N.E.2d at 318. In such a case, "the director will be required to show that the transaction was fair and reasonable to the corporation notwithstanding his or her personal interest." *Granada Invest., Inc. v. DWG* (N.D.Ohio 1993), 823 F.Supp. 448, 456; *Gries, supra,* 26 Ohio St.3d at 22, 26 OBR at 18, 496 N.E.2d at 965; *Apicella, supra,* at 248, 17 OBR at 515, 479 N.E.2d at 319.

However, even if the directors are not disinterested, "[a] disinterested majority of the shareholders of a corporation have the power to ratify directors' frauds provided there is no actual fraud in either inducing or effecting the ratification." *Claman v. Robertson* (1955), 164 Ohio St. 61, 57 O.O. 89, 128 N.E.2d 429, paragraph one of the syllabus. See, also, *Ohio Drill & Tool Co. v. Johnson* (S.D.Ohio 1973), 361 F.Supp. 255, 262 ("if all material facts are disclosed to the corporate shareholders and, acting upon such disclosure, they approve or ratify the officer's actions, there is no liability"); *Stroud v. Grace* (Del.1992), 606 A.2d 75, 82 ("fully informed shareholder vote in favor of a disputed transaction ratifies board action in absence of fraud"); *Michelson v. Duncan* (Del.1979), 407

A.2d 211, 219 ("where a majority of fully informed shareholders ratify action of even interested directors, an attack on the ratified transaction normally must fail"). This case law is in accord with R.C. 1701.60:

"(A) Unless otherwise provided in the articles or the regulations:

"(1) No contract, action, or transaction shall be void or voidable with respect to a corporation for the reason that it is between or affects the corporation and one or more of its directors or officers, or between or affects the corporation and any other person in which one or more of its directors or officers are directors, trustees, or officers, or have a financial or personal interest, or for the reason that one or more interested directors or officers participate in or vote at the meeting of the directors or a committee of the directors that authorizes such contract, action, or transaction, if in any such case any of the following apply:

" * * *

"(b) The material facts as to his or their relationship or interest and as to the contract, action, or transaction are disclosed or are known to the shareholders entitled to vote thereon and the contract, action, or transaction is specifically approved at a meeting of the shareholders held for such purpose by the affirmative vote of the holders of shares entitling them to exercise a majority of the voting power of the corporation held by persons not interested in the contract, action, or transaction * * *."

The corporate action that plaintiffs challenge was in every instance approved or ratified by the majority vote of shareholders at their weekly Saturday meetings; the action proposed and taken was well documented and thoroughly explained and discussed; the record portrays a fully informed and alert shareholder group with numerous opportunities to veto the directors' and officers' recommendations. But they did not do so.

### A. Sale of Michigan–9; Distribution of Proceeds (Count I)

Plaintiffs claim that defendants acted in bad faith toward Cellwave and the minority shareholders by making the distribution of most of the proceeds from the sale of Michigan–9 to satisfy their personal needs, *i.e.*, their interest in purchasing the majority shareholdings of Thompson, pursuant to the settlement of the Thompson case.

The evidence is undisputed that plaintiffs themselves requested assurance at the November 16, 1991 meeting that most of the $14 million proceeds from the sale of Michigan–9 (after expenses) would be distributed to the shareholders. The sale was approved by the shareholders with that understanding at the March 7, 1992 meeting, although plaintiffs chose not to attend. There was no breach of fiduciary duty in the sale of Michigan–9 or in the distribution of

proceeds therefrom to each shareholder pro rata. All corporate distributions to shareholders are made to satisfy the "personal needs" of shareholders—that is why they are shareholders—to benefit personally from the financial success of the corporation. So long as the shareholders share in proportion to their holdings, there is no breach of fiduciary duty.

It might very well be that the wiser course of corporate action would have been to preserve the Michigan–9 proceeds in the corporation for the purpose of exploiting the Ohio–6 license. But it is not for the courts to second-guess the choices the majority shareholders make under such circumstances.

In any event, the unanimous agreement of the shareholders to distribute assets as a dividend is binding. See *Matter of Reading* (C.A.3, 1983), 711 F.2d 509, 519. Nor can the plaintiffs, as they did, induce the corporation and the shareholders to make a dividend distribution, accept the benefits thereof, and then assert a cause of action founded on breach of fiduciary duty. Compare *State ex rel. Cities Serv. Oil Co. v. Orteca* (1980), 63 Ohio St.2d 295, 299, 17 O.O.3d 189, 191, 409 N.E.2d 1018, 1021 ("Equitable estoppel precludes a party from asserting certain facts where the party, by his conduct, has induced another to change his position in good faith reliance upon that conduct."); *State ex rel. Madden v. Windham Exempted Village School Dist. Bd. of Edn.* (1989), 42 Ohio St.3d 86, 90, 537 N.E.2d 646, 649.

The decision to pay out the proceeds from the sale of Michigan–9 as a dividend is also protected by the business judgment rule. A legitimate business reason for paying out the proceeds of this sale is apparent from the record. Cellwave won two licenses in an FCC lottery. Cellwave sold its Michigan–9 licenses for $14 million. It was within the corporate prerogatives for Cellwave to distribute some of the benefits of the lottery to its shareholders, who unanimously approved the sale. This was especially true when Cellwave was able to exploit its Ohio–6 asset with nonrecourse financing through stock pledges and sale of stock.

■ Plaintiffs argued below that all corporate action was void because proper notices of the shareholder meetings were not given designating the purpose of each meeting. However, they did not raise this argument in their appellate brief. "In reviewing the judgment of a lower court, a court of appeals need only pass upon errors assigned and briefed; errors not specifically raised may be discarded." *Toledo's Great E. Shoppers City, Inc. v. Abde's Black Angus Steak House No. III, Inc.* (1986), 24 Ohio St.3d 198, 202, 24 OBR 426, 429, 494 N.E.2d 1101, 1104. Nonetheless, for the sake of completeness, we will address this claim. There is no question that notice of the meetings was given for each Saturday starting with November 16, 1991 through December 28, 1991 (Code of Regulations, Art. I–D) and each Saturday between January 28, 1992 and April 28, 1992 (Notice of Meetings, dated January 9, 1992). It is true that the specified purpose

of each meeting was not included in the notice, but every shareholder knew what was under discussion and what had been up for action for months. Furthermore, plaintiffs were sent copies of minutes and letters from counsel, which kept them posted as to all developments. Plaintiffs knowingly failed to attend the meetings and are estopped from complaining about the lack of specific purposes because they did not raise that objection at the time, recognizing no doubt it would have been easily cured. As shareholders in a close corporation are more like partners, the plaintiffs also had a duty of good faith and full disclosure. There was no prejudice to plaintiffs from the lack of a specific purpose in the notice of meetings.

### B. Stock Pledge Fee (Count II)

■■■ Plaintiffs claim that defendants acted in bad faith toward Cellwave by paying themselves stock pledge fees (aggregating $300,000) for no legitimate business purpose.

Once the unanimous decision to sell Michigan–9 and distribute most of the proceeds was made, Cellwave needed funds to construct and operate Ohio–6.

Cellwave entered into a $3,000,000 loan agreement with its lender. The PUCO determined that the loan terms and proposed use of proceeds were reasonable. Finding and Order of PUCO, April 30, 1992, case No. 92–621–RC–AIS. The lender NTF did not require any shareholder to personally guarantee the loan. However, it required security for the nonrecourse loan in the form of a stock pledge. All the shareholders were offered the same commitment fee for agreeing to pledge their Cellwave stock to support the loan to Cellwave. The pledging shareholders were exposing their interest in the corporation to a risk which plaintiffs did not. They could lose their whole investment if Cellwave defaulted. The fee was compensation for exposing their interest. It cannot be said that the pledge fee was without legitimate corporate purpose.

The directors' decision to obtain the loan, pledge the stock and pay a commitment fee was prudent management and is protected by the business judgment rule. Since all shareholders were given an equal opportunity to participate in the stock pledge and obtain the fee, no unfair advantage was taken by the majority shareholders. The loan terms and the pledge arrangements were ratified by the majority vote of the shareholders, who were fully advised in the premises.

### C. The Stock Offering (Count III)

■■■ Plaintiffs claim that defendants acted in bad faith in issuing the new stock to themselves at less than fair value.

Plaintiffs were given the same right as all other shareholders to purchase their pro rata share of Cellwave's proposed stock offering and avoid dilution. Plaintiffs

consulted their attorney, and decided, for their own personal reasons, that they did not want to invest any more funds in Cellwave. Cellwave then issued sixteen shares of stock to its shareholders for $3,800,000 after receiving approval from the PUCO. Since all shareholders had the right to participate equally in the stock offering, no fiduciary breach occurred. Compare *Menke v. Gold Medal Oil Co.* (1933), 47 Ohio App. 180, 185–186, 191 N.E. 472, 474 (no actionable wrong committed where minority acquires control through purchase of new shares not subscribed by the other shareholders). The business judgment rule protects the issuance of stock from attack as a breach of the duty of care. The claim that the stock was sold for less than fair market value has no foundation in the record. The consideration for the new stock was within the directors' discretion. R.C. 1701.14(A).

### D. Payment of Fees to Burke and Horrigan (Count IV)

█ Plaintiffs claim that defendants acted in bad faith in paying $600,000 to Burke and Horrigan for their services in arranging the sale of Michigan–9 and obtaining financing for Ohio–6.

Shareholders, convened at a duly noticed meeting, determined the amount of compensation to pay Burke and Horrigan, who were also shareholders. The work and services of Burke and Horrigan were well known to the shareholders. Neither Burke nor Horrigan was present or participated in the decision regarding their compensation, leaving same to the exclusive discretion of the disinterested shareholders.

█ Plaintiffs claim the compensation was excessive and was an act of self-dealing and waste, but we find no evidence in the record to support these allegations. See, generally, *Worth v. Huntington Bancshares, Inc.* (1989), 43 Ohio St.3d 192, 197, 540 N.E.2d 249, 255 (in determining executive compensation, "it is certainly not for this court to second-guess the business judgment of corporate executives"). The value of the officers' and directors' services in rescuing the corporation from the FCC construction deadlines, negotiating and renegotiating the sale of Michigan–9, and the efforts and skill in financing, stock pledges and stock issue are not subject to objective standards. Since a majority of shareholders, with no pecuniary interest in the compensation of Burke and Horrigan, approved the compensation, the matter was handled properly within corporate protocols. See R.C. 1701.60(A)(1)(b). It is clear that those shareholders who voted to pay Burke and Horrigan voted against their own economic self-interest as shareholders, so there was no self-dealing involved. Self-dealing occurs when the majority shareholders cause the dominated corporation to act in such a way that the majority shareholders receive something from the corporation to the exclusion and detriment of the minority shareholders. *Sinclair Oil v.*

*Levien* (Del.Supr.1971), 280 A.2d 717, 720. See, also, *Stroud v. Grace* (Del. Supr.1992), 606 A.2d 75, 82 ("a fully informed shareholder vote in favor of a disputed transaction ratifies board action in the absence of fraud"). Here, the board did not even recommend the compensation but left the decision to the shareholders in a democratic and well-documented fashion. There was no breach of fiduciary duty in the process.

### E. The Tax Dispute (Count V)

■ Plaintiffs claim that defendants withheld critical facts from the auditors resulting in an improper tax return for Cellwave.

Cellwave did make a federal income tax election under the provisions of Section 453(d), Title 26, U.S.Code, to treat money received in 1992 from the sale of Michigan–9, as though it was received in 1991. In the summary judgment opposition, plaintiffs asserted that defendants shifted income which should have been reported in 1992 into 1991, which "caused the minority shareholders of Cellwave, Inc. to report a gain and pay a tax a year earlier than necessary." Implicit in the allegation is the assertion that defendants received some tax benefit not shared by the plaintiffs. Assuming every implication from this assertion to be true, *i.e.,* Cellwave's tax election required plaintiffs to pay their taxes "a year earlier than necessary," which election did not affect the ultimate amount of plaintiffs' taxes, the assertion does not, as a matter of law, constitute a breach of fiduciary duty. In *Grace v. Grace Natl. Bank of New York* (C.A.2, 1972), 465 F.2d 1068, the minority shareholder alleged that the majority shareholder caused the corporation to make a federal income tax election which only benefited the majority shareholder and required the minority shareholder to pay taxes early. However, the minority shareholder did not allege that the amount of his taxes was adversely affected by the federal income tax election, just the timing of the payment thereof. The United States Court of Appeals for the Second Circuit held at 1073:

"A [majority shareholder] should not be compelled to ignore the tax benefits afforded by [the Internal Revenue Code] * * * whenever any minority shareholder * * * would prefer an alternate method, not to decrease his tax burden, but simply to change its timing * * *. [W]e see no violation of fundamental fairness in selecting a course of conduct which took maximum advantage of the tax laws without unduly disadvantaging any minority shareholder."

Plaintiffs argued in their summary judgment opposition that "[n]o benefit to Cellwave, Inc., was achieved by the shifting of this tax burden." That is no doubt true because Cellwave is a Subchapter S corporation under the Internal Revenue Code. Generally, such corporations are not required to pay taxes (see Section 1363[a], Title 26, U.S.Code) because the shareholders pay taxes on the portion of

the corporate income allocable to them (see Section 1366[a], Title 26, U.S.Code). Since an "S corporation" pays no tax, a tax election will neither benefit nor disadvantage such corporation, when viewed separate and apart from its shareholders. Consequently, this cannot be a derivative claim brought for the benefit of the corporation.

Furthermore, defendants offered evidence from Cellwave's auditors (Ernst & Young) that the election was properly made, they were fully informed of the relevant facts, and there was no violation of the tax code. Plaintiffs offered no specific facts or expert opinion to rebut this evidence.

Summarizing, we find no error in the trial court's granting of summary judgment for defendants. Plaintiffs failed to contest the facts and evidence offered by defendants which rebutted the allegations of the complaint.

Plaintiffs' sole assignment of error is overruled.

The judgment is affirmed.

## APPEAL NO. 65838

The sole assignment of error on defendants' appeal is that the trial court erred in denying defendants' motion to tax costs, ruling that it lacked jurisdiction because the case to which the costs related was on appeal. This appeal has merit. *Kane v. Ford Motor Co.* (1984), 17 Ohio App.3d 111, 115–116, 17 OBR 173, 177–178, 477 N.E.2d 662, 667–668 ("a trial court has jurisdiction to rule on a motion to tax costs notwithstanding the pendency of an appeal of the underlying cause of action"). *Wilson v. LTV Steel Co.* (June 11, 1992), Cuyahoga App. Nos. 59515 and 59955, unreported, 1992 WL 136213 ("the decision to grant a motion for costs and attorney fees to be paid by appellant does not interfere with the power of the appellate court to review the judgment under appeal and affirm, reverse or modify it").

The judgment dismissing defendants' motion for costs is reversed and the matter is remanded for consideration by the trial court.

*Judgment accordingly.*

PATTON, P.J., and JAMES D. SWEENEY, J., concur.