Timothy **BENINCASA, Plaintiff**

v.

**FLIGHT SYSTEMS AUTOMOTIVE GROUP L.L.C., et al.,
Defendants**

**No. 3:02 CV 7125.**

United States District Court,
N.D. Ohio,
Western Division.

Dec. 16, 2002.

Dennis A. Lyle, Fuller & Henry, Toledo, OH, Kristi L. Clark, Fuller & Henry, Findlay, OH, for Timothy C Benincasa, Plaintiff.

Michelle L. Coakley, R. Christopher Cataldo, Jaffe, Raitt, Heuer & Weiss, P.C., Detroit, MI, Robert J. Gilmer, Jr., Thomas J. Gibney, Eastman & Smith, Toledo, OH, for Flight Systems Automotive Group, L.L.C., fka Crawford–Green, L.L.C. Ronald Skarupa, Stephen Fries, John Doe(s), Defendants.

## ORDER

CARR, District Judge.

Plaintiff Timothy Benincasa brings this suit against Flight Systems Automotive Group L.L.C. f/k/a Crawford/Greene, L.L.C. ("Crawford/Greene"), Ronald F. Skarupa, and Steven C. Fries, alleging breach of contract, breach of express warranty, intentional and negligent misrepresentation, and breach of fiduciary duty. This court has jurisdiction pursuant to 28 U.S.C. § 1332. Pending is plaintiff's motion to remand. For the following reasons, the motion shall be denied.

## BACKGROUND

Plaintiff and defendants Skarupa and Fries all are citizens of Ohio. Until September 30, 1999, these three also owned all of the outstanding stock in EPIC Technologies, Inc. ("EPIC"). EPIC engages in the manufacture, production, distribution, and sale of electronics parts. This case arises from the sale of the stock in EPIC to Crawford/Greene, a Michigan limited liability company, on September 30, 1999.

There were seventeen shares of EPIC. Skarupa owned nine shares, or 53 percent. Plaintiff owned six shares, or 35 percent. Fries owned two shares, or 12 percent. Skarupa was the CEO and President of EPIC. Fries was the Vice President and Chief Financial Officer. Plaintiff was the Vice President and Corporate Secretary. The three were EPIC's only officers and directors.

In 1997, plaintiff, Fries, and Skarupa all loaned the corporation money from their personal 401(k) accounts. Skarupa loaned it about $50,000. Fries loaned it about $30,000. Plaintiff loaned the corporation about $20,000.

In 1998, Skarupa lent the corporation $150,000. Skarupa also personally guaranteed corporate loans of about $1 million.

Because of the corporation's financial difficulties, the shareholders began looking for a buyer. In January, 1999, Crawford/Greene offered the shareholders $1 million for their stock. Plaintiff turned down the offer because he "didn't think it was enough." (Skarupa Depo. at 69). Plaintiff allegedly rejected the idea of showing the $1 million offer to an accountant or attorney because it would be "a waste of money." (Skarupa Depo. at 109).

In 1999, EPIC's financial problems worsened.

Plaintiff alleges that in April, 1999, Skarupa told him that Crawford/Greene had offered to purchase plaintiff's stock in EPIC for $500,000 in cash and an additional $1.5 million paid out over ten years. Skarupa denies telling plaintiff of such an offer, and Fries says he was not aware of this offer. Plaintiff rejected this alleged offer because it was "just not that much." (Pl.Exh. A). Plaintiff alleges that on April 19, 1999, Skarupa told plaintiff that if he did not accept this offer for his stock, his job likely would be terminated. Skarupa said he did not threaten plaintiff with termination if he refused to accept the deal with Crawford/Greene. For purposes of this motion, defendants are assuming that plaintiff's allegation of a $2 million offer for his stock is true.

After plaintiff refused the offer or offers, Skarupa said EPIC heard nothing more from Crawford/Greene until summer 1999, when it contacted EPIC and said it still was interested in the company. Skarupa said he told plaintiff that because the

company had lost money in 1999, Crawford/Greene's new offer almost surely would be lower than $1 million.

In September, 1999, Crawford/Greene offered each EPIC shareholder $50 for his stock. At meetings with Crawford/Greene representatives, the parties discussed why the offer had fallen from $1 million to $150. Plaintiff was present at the meetings. The offer had fallen because EPIC had "lost about a million dollars since January [1999]." (Skarupa Depo. at 123). Plaintiff says that at meetings with Crawford/Greene representatives Richard Crawford and Pat Greene, Skarupa, Fries, Crawford, and Greene told him that if he agreed to sell his shares of EPIC, he would receive stock in a company that could achieve up to $250 million in sales. Plaintiff says he also was promised employment with such a company.

EPIC did not obtain an outside audit of the September offer, but Skarupa and Fries evaluated it internally by examining the corporation's financial statements. According to plaintiff, Skarupa and Fries negotiated more of the deal than he did. Skarupa testified that plaintiff visited Greene at least once, however, and "seemed very thorough as far as checking out everything else that he could." (Skarupa Depo. at 83–84).

In negotiations with Crawford/Greene, Skarupa said he insisted on provisions to repay the shareholders' loans and to employ the shareholders with the successor company. Skarupa said plaintiff was quiet at the meetings, but remembered him saying that the corporation was worth more than Crawford/Greene was offering for it.

Skarupa said he asked Crawford/Greene for a three-year employment contract for each shareholder. Crawford/Greene instead offered Skarupa a three-year contract, Fries a one-year contract, and plaintiff a one-year contract. Skarupa said the reason his employment contract was long-

er was that "Greene told me that that's all I'll give you, and I told him I'd present it to Steve [Fries] and Tim [Benincasa] and see if they'd go along with it." (Skarupa Depo. at 125).

On September 10, 1999, Skarupa allegedly told plaintiff that if he did not sell, EPIC would be "in the tank." (Doc. 19, p. 7.) Plaintiff alleges that when he asked to have a due diligence review conducted to confirm the deal, Skarupa and Fries overruled him.

Plaintiff alleges that Crawford/Greene told him, before the signing, that he would receive more than $50 for his stock. On September 30, 1999, Skarupa wrote a letter to plaintiff outlining the corporation's current financial condition and urging plaintiff to "do the deal with the Crawford group as soon as possible" because "we must do something quickly or we will not have anything to sell at all." The letter stated that Greene wanted to achieve sales of between $200 million and $500 million. Skarupa stated, "I think we can grow with them and recover anything we have lost. (Pl.Exh. B).

Plaintiff, Skarupa, and Fries entered into two written agreements with Crawford/Greene on September 30, 1999, pursuant to which Crawford/Greene agreed to purchase all of the stock in EPIC for a total of $150, with $50 going to each shareholder. A side letter agreement specifically referred to the stock purchase agreement, incorporating all of its terms.

The parties agreed that EPIC would enter into a three-year employment contract with Skarupa and pay him $127,000 per year. Fries' employment contract was for one year at a salary of $73,000. Plaintiff's employment contract was for one year at a salary of $122,000. These salaries matched the annual salaries that the three were being paid before the agreement. Additionally, Fries and plaintiff re-

ceived a $6,000 per year expense account, a mobile phone, and an allowance for a company car. Fries received a $500,000 life insurance policy, and plaintiff received a $1,000,000 life insurance policy.

The side letter agreement provided that Crawford/Greene would repay Skarupa's $150,000 loan and use its best efforts to obtain the release of Skarupa's personal guarantee to the of the corporate loans. Crawford/Greene also repaid each shareholder's 401(k) loans in full.

The side letter agreement provided that the three shareholders of EPIC would receive stock in Crawford/Greene's holding company in proportion to their interests in EPIC before the transaction. Upon closing the deal, Skarupa was to receive a 1.6 percent interest in the holding company, plaintiff a 1.1 percent interest, and Fries an 0.3 percent interest. The three would receive these interests in the holding company if a specified transaction occurred within one year, and the interests would double if the transaction was not completed within one year. At plaintiff's request, the agreement also contained a put and call option, applicable to the stock of all three EPIC shareholders. If either option was exercised, the purchase price for the shares would be "fair market value of such equity, as determined by appraisal." (Doc. 26, Exh. C., p. 2).

After the deal was completed, Crawford/Greene caused EPIC to call in plaintiff's stock. Its value was set at $100.

When plaintiff's one-year employment contract expired, it was extended for three months and then terminated. EPIC then offered plaintiff a position as a manufacturer's representative, which he accepted.

Plaintiff's position is that of an independent contractor.

Skarupa and Fries remain employed. Skarupa's contract expired at the end of September, 2002, and he anticipated taking another job with EPIC. Fries is employed with EPIC as its chief financial officer and vice president/treasurer. He is an at-will employee. His employment contract expired at the end of one year and was not renewed.

Plaintiff filed this suit in the Huron County Court of Common Pleas on February 5, 2002, claiming damages in excess of $5 million. Count V of plaintiff's complaint, the sole claim against Skarupa and Fries, alleges breach of fiduciary duty. Plaintiff alleges that during negotiations, Skarupa and Fries failed to preserve the assets of the corporation, failed to negotiate terms that protected him, and ultimately assisted Crawford/Greene in encouraging plaintiff to sell his interest under unfavorable terms that were not accurately presented to him.

On March 6, 2002, defendants removed the case based on diversity jurisdiction. On May 8, 2002, plaintiff timely moved to remand the case to the Huron County Court of Common Pleas, pursuant to 28 U.S.C. § 1447(c).

## REMOVAL

■ Removal is governed by 28 U.S.C. § 1441 *et seq.*[1] The Supreme Court has admonished lower courts to read § 1441 narrowly with "[d]ue regard for the rightful independence of state governments . . ." *Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S. 100, 109, 61 S.Ct. 868, 85 L.Ed. 1214 (1941) (quoting *Healy v. Ratta,* 292

---

1. 28 U.S.C. § 1441 states:

Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

U.S. 263, 270, 54 S.Ct. 700, 78 L.Ed. 1248 (1934)). *See also Long v. Bando Mfg. of Am., Inc.,* 201 F.3d 754, 757 (6th Cir.2000) ("[R]emoval statutes are to be narrowly construed."); *Musson Theatrical, Inc. v. Fed. Express Corp.,* 89 F.3d 1244, 1252 (6th Cir.1996) ("The Constitution allows federal courts only a limited and special jurisdiction, and powers not given to the federal courts by Congress are reserved to the primary repositories of American judicial power: state courts.") Only state-court actions that could have been filed in federal court originally may be removed to federal court by the defendant. *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). Absent diversity of citizenship, federal-question jurisdiction is required. *Id.*

■ Diversity of citizenship exists under 28 U.S.C. § 1332 only when no plaintiff and no defendant are citizens of the same state, *United States Fidelity & Guar. Co. v. Thomas Solvent Co.,* 955 F.2d 1085, 1089 (6th Cir.1992), and the amount in controversy exceeds $75,000.

■ The party seeking removal bears the burden of establishing its right thereto. *Her Majesty the Queen In Right of the Province of Ontario v. City of Detroit,* 874 F.2d 332, 339 (6th Cir.1989) (citing *Wilson v. Republic Iron & Steel Co.,* 257 U.S. 92, 97–98, 42 S.Ct. 35, 66 L.Ed. 144 (1921)). *See also Certain Interested Underwriters at Lloyd's London, England v. Layne,* 26 F.3d 39, 41 (6th Cir.1994) (noting that the party seeking to remove a case bears the burden of showing diversity). All doubts are to be resolved against removal. *Wilson v. USDA,* 584 F.2d 137, 142 (6th Cir.1978).

## DISCUSSION

### A. Fraudulent Joinder

The defendants argue that complete diversity exists in this case because plaintiffs Skarupa and Fries were fraudulently joined.

■ "When a non-diverse party has been joined as a defendant, then in the absence of a substantial federal question the removing defendant may avoid remand only by demonstrating that the non-diverse party was fraudulently joined." *Jerome–Duncan, Inc. v. Auto–By–Tel., L.L.C.,* 176 F.3d 904, 907 (6th Cir.1999) (quoting *Batoff v. State Farm Ins. Co.,* 977 F.2d 848, 851 (3d Cir.1992)). Fraudulent joinder is "a judicially created doctrine that provides an exception to the requirement of complete diversity." *Coyne v. American Tobacco Co.,* 183 F.3d 488, 493 (6th Cir.1999) (quoting *Triggs v. John Crump Toyota, Inc.,* 154 F.3d 1284, 1287 (11th Cir.1998)).

■ Under the doctrine of fraudulent joinder, the inquiry is whether there is at least a colorable claim against the non-diverse parties in state court. *Alexander v. Elec. Data Sys. Corp.,* 13 F.3d 940, 949 (6th Cir.1994). That is, "the question is whether there is arguably a reasonable basis for predicting that the state law might impose liability on the facts involved." *Id.* (quoting *Bobby Jones Garden Apartments, Inc. v. Suleski,* 391 F.2d 172, 176 (5th Cir.1968)). "[I]f there is a colorable basis for predicting that a plaintiff may recover against non-diverse defendants," the action must be remanded to state court. *Coyne,* 183 F.3d at 493. The district court must resolve all disputed questions of fact and ambiguities in the controlling state law in favor of the nonremoving party. *Id.*

Whether this case will remain in federal court, therefore, depends on whether the plaintiff has at least a colorable claim against defendants Skarupa and Fries for breach of fiduciary duty. I conclude that he does not have a colorable claim against these defendants.

## B. Breach of Fiduciary Duty

Plaintiff alleges Skarupa and Fries breached a fiduciary duty to plaintiff in the sale of EPIC to Crawford/Greene. Plaintiff alleges that these two defendants did not secure a fair market value for the sale of his interests; did not properly investigate the buyer; failed to protect the value of EPIC, causing a substantial loss in value; did not act with due diligence in obtaining consultants; and placed their own interests above the interests of plaintiff as a minority shareholder.

■ A close corporation is a corporation with few shareholders and whose corporate shares are not generally traded on a securities market. *Crosby v. Beam*, 47 Ohio St.3d 105, 107, 548 N.E.2d 217 (1989). The Ohio Supreme Court has explained the special relationship between shareholders of close corporations:

> [T]he close corporation structure ... gives majority or controlling shareholders opportunities to oppress minority shareholders.... Generally, there is no ready or available market for the stock of a minority shareholder in a close corporation. This presents a plight for a minority shareholder in a close corporation who can become trapped in a disadvantageous situation from which he cannot be easily extricated.

*Id.* at 108, 548 N.E.2d 217.

■ Before the transaction with Crawford/Greene, EPIC was not publicly traded and its seventeen shares were owned by a total of three individuals. It was a close corporation. Because the duties of shareholders in a close corporation depend on whether they are majority shareholders, I first will consider plaintiff's claim against Skarupa, who was the majority shareholder of EPIC until September 30, 1999.

### 1. Skarupa

■ Generally, majority shareholders have a fiduciary duty to minority shareholders. *Crosby*, 47 Ohio St.3d at 108, 548 N.E.2d 217. The Supreme Court has held that "[a] majority shareholder has a fiduciary duty not to misuse his power by promoting his personal interests at the expense of corporate interests." *United States v. Byrum*, 408 U.S. 125, 137, 92 S.Ct. 2382, 33 L.Ed.2d 238 (1972).

In *Crosby*, the Ohio Supreme Court found a heightened fiduciary duty between majority and minority shareholders in a close corporation. 47 Ohio St.3d at 108, 548 N.E.2d 217. The court stated:

> Majority or controlling shareholders breach [their] fiduciary duty to minority shareholders when control of the close corporation is utilized to prevent the minority from having an equal opportunity in the corporation. Control of the stock in a close corporation cannot be used to give the majority benefits which are not shared by the minority.
>
> \*   \*   \*   \*   \*   \*
>
> Where majority or controlling shareholders in a close corporation breach their heightened fiduciary duty to minority shareholders by utilizing their majority control of the corporation to their own advantage, without providing minority shareholders with an equal opportunity to benefit, such breach, absent a legitimate business purpose, is actionable.

*Id.* at 109, 548 N.E.2d 217 (citations omitted).

A breach of the majority's fiduciary duty to the minority occurred in *Estate of Schroer v. Stamco Supply, Inc.*, 19 Ohio App.3d 34, 40, 482 N.E.2d 975 (1984). In that case, the majority shareholders caused the corporation to repurchase the majority's stock on terms more favorable than the terms offered to the minority.

Another common abuse of majority shareholder power is the freeze-out, a

"manipulative use of corporate control to eliminate minority shareholders, or to reduce their share of voting power or percentage or ownership of assets, or otherwise unfairly deprive them of advantages or opportunities to which they are entitled." *Estate of Schroer,* 19 Ohio App.3d at 38, 482 N.E.2d 975. The Supreme Court suggested in *Crosby* that other breaches of fiduciary duty could include a refusal to declare dividends, or the removal of a minority shareholder from the payroll without a legitimate business purpose. 47 Ohio St.3d at 109, 548 N.E.2d 217.

■■■ As majority shareholder, Skarupa owed plaintiff an equal opportunity to benefit from the transaction with Crawford/Green. Skarupa did not breach this duty to plaintiff.

Plaintiff and Skarupa each received $50 for their shares in EPIC. This opportunity was equal. They received stock in the holding company in proportion to their interests in EPIC. While Skarupa's interest was greater, this did not represent an unequal opportunity. The stock that plaintiff and Skarupa received was subject to the identical put-and-call option. The fact that plaintiff's stock was called in, while Skarupa's was not, does not change the fact that each had an equivalent opportunity to own stock, and the same conditions of ownership applied to each.

Their 401(k) loans were repaid, and while Skarupa's loan was worth more money, this does not represent an unequal opportunity for Skarupa. Skarupa and plaintiff merely were paid in full. For the same reason, the repayment of Skarupa's $150,000 loan and the release of his personal guarantee of the corporation's loans do not represent unequal opportunities for Skarupa. Unlike Skarupa, plaintiff had not made any other loans to the corporation. Plaintiff and Skarupa received the same benefit: full repayment and release.

■■■ This conclusion is supported by *Koos v. Central Ohio Cellular. Inc.,* 94 Ohio App.3d 579, 641 N.E.2d 265 (1994). In *Koos,* the state appeals court found the majority shareholders did not breach their fiduciary duty to the minority shareholders in the stock transactions at issue, "as they afforded plaintiffs the same opportunities of which the majority took advantage." *Id.* at 589, 641 N.E.2d 265. "So long as the shareholders share in proportion to their holdings, there is no breach of fiduciary duty." *Id.* at 592, 641 N.E.2d 265.

Plaintiffs in *Koos* could not "induce the corporation and the shareholders to make a dividend distribution, accept the benefits thereof, and then assert a cause of action founded on breach of fiduciary duty." *Id.* at 592, 641 N.E.2d 265. Plaintiff in this case likewise cannot consent to a stock transaction, accept numerous benefits, and then assert this action against his fellow shareholders.

■■■ Defendant Skarupa must, however, do more than show plaintiff consented to the transaction with Crawford/Greene:

> [T]he breach by a majority shareholder in a close corporation of a fiduciary duty imposed by law does not rest upon whether or not a minority shareholder consented or acquiesced to that breach.... [T]here exists a presumption that the one owing a fiduciary duty by virtue of superior position must go forward with the burden of proof on the fairness of business transactions. The fiduciary must demonstrate that the one to whom the fiduciary duty was owed had full knowledge of and approved the transactions.

*Yackel v. Kay,* 95 Ohio App.3d 472, 480, 642 N.E.2d 1107 (1994).

In *Yackel,* the minority shareholder won a judgment against the majority shareholder based on breach of fiduciary duty.

The majority shareholder could not prove the minority shareholder knowingly ratified or approved of the majority shareholder's transactions. *Id.* (citing *Testa v. Roberts,* 44 Ohio App.3d 161, 166, 542 N.E.2d 654 (1988)).

In this case, defendant Skarupa has produced abundant evidence that the plaintiff knowingly ratified and approved of the transactions. The plaintiff was a member of the board of directors during the negotiations with Crawford/Greene. The plaintiff attended negotiation meetings. The plaintiff even suggested the addition of contract terms; his suggested put-and-call provision was added to the side letter agreement. And, of course, the plaintiff signed the stock purchase agreement and the related documents, which clearly stated the terms of the transaction.

■ Plaintiff suggests that defendants, including Skarupa, pressured him to sign. The law distinguishes between pressure, (i.e., forceful encouragement), which is not actionable, *Blodgett v. Blodgett,* 49 Ohio St.3d 243, 246, 551 N.E.2d 1249, and duress, which is actionable. *Id.* A contract is voidable for economic duress if 1) one side involuntarily accepted the terms of another; 2) that circumstances permitted no other alternative; and 3) that said circumstances were the result of coercive acts of the opposite party. *Id.* Plaintiff has not alleged that he signed under duress, nor could he do so on the facts presented.

To the extent that Skarupa's three-year employment contract was more generous than plaintiff's one-year employment contract, the fact that plaintiff knowingly ratified and approved of this difference prevents him from asserting a claim for breach of fiduciary duty.[2]

■ Plaintiff suggests that Skarupa breached his fiduciary obligations by being more involved in negotiating the transaction. This theory is meritless. In *Aschinger v. Columbus Showcase Co.,* 934 F.2d 1402 (6th Cir.1991), the Sixth Circuit held that defendant shareholder did not breach a fiduciary duty to plaintiff shareholder where both plaintiff and defendant held equal interest in the corporation and had equal access to all relevant information regarding stock value. The plaintiff could not produce evidence that the defendant knew but did not disclose facts about the actual worth of the stock. 934 F.2d at 1407. The court specifically rejected the plaintiff's argument that a fiduciary duty was created because defendant was more involved with the financial affairs of the company:

> A fiduciary relationship cannot be predicated on one party's allegedly superior knowledge of the facts surrounding a transaction when the relevant facts are readily available to both parties. Plaintiff cannot transform his brother into a fiduciary by his own failure to investigate a fair price or request an independent appraisal.

*Id.* at 1408.

Likewise, in this case plaintiff has attempted to demonstrate that Skarupa's allegedly superior knowledge of the transaction gave rise to a breach of his fiduciary duty. Plaintiff has not alleged, however, that the facts available to Skarupa were not available to him. Indeed, Skarupa has demonstrated that the facts were available to plaintiff. As vice president and director of EPIC, plaintiff had access to the corporation's financial data and, as noted, at-

---

**2.** Skarupa could not negotiate a management position for himself under his contract. When Skarupa started working under the contract after the change in owners, he performed tasks such as cleaning a warehouse, counting bags, and moving equipment. Skarupa obtained a sales position in February, 2002, but expected to take a lower-paying job with the company when his contract expired in September, 2002.

tended meetings with Crawford/Greene discussing the valuation of the corporation's stock. Additionally, Skarupa sent plaintiff some of EPIC's financial data on the day he signed the stock purchase agreement.

Plaintiff's theory of breach of fiduciary duty appears to be based on the drop in Crawford/Greene's asking price. Regardless of whether Crawford/Greene's initial offer was $1 million or $2 million, plaintiff does not dispute the fact that he himself vetoed it. Plaintiff then accepted the lower offer some months later. Plaintiff has not shown Skarupa caused the loss in the corporation's value; rather, it appears that the decline was caused by external forces and business conditions.

■ Plaintiff's employment contract was not renewed, and his stock was called in. Skarupa did not participate in the decision to buy back the stock, nor did management discuss it with him. Skarupa says he does not know why plaintiff's stock was bought back. Skarupa also says he was not involved in the termination of plaintiff. Plaintiff has not alleged Skarupa's involvement in the successor corporation's actions. After Skarupa became a minority shareholder, Skarupa owed plaintiff no fiduciary duty. These actions cannot constitute a breach of Skarupa's fiduciary duty toward plaintiff, because that duty ended upon the consummation of the stock purchase agreement.

### 2. Fries

■ Plaintiff argues that because Skarupa assigned Fries the primary responsibility within the corporation of investigating the sale of EPIC, Fries owed a fiduciary duty to plaintiff.

Before the transaction with Crawford/Greene, Fries owned 12 percent of EPIC's stock. After the transaction, Fries owned 0.3 percent.

■ Minority shareholders owe no fiduciary duty to fellow shareholders. *Priddy v. Edelman*, 883 F.2d 438, 445 (6th Cir.1989). The leading case on close corporations, *Crosby*, does not suggest that the heightened fiduciary duties within close corporations extend to minority shareholders' informal relationships.

■ "While it is true that a fiduciary duty may be created out of an informal relationship, this occurs *only* when *both* parties understand that a special trust or confidence has been reposed." *Lee v. Cuyahoga Cty. Court of Common Pleas*, 76 Ohio App.3d 620, 623, 602 N.E.2d 761 (1991) (emphasis in original). "The assertion that one party reposed a 'special trust' in the other party 'is insufficient as a matter of law without the allegation that both parties understood that this fiduciary relationship existed.'" *Nichols v. Chicago Title Ins. Co.*, 107 Ohio App.3d 684, 699, 669 N.E.2d 323 (1995) (citing *Lee*, 76 Ohio App.3d at 623, 602 N.E.2d 761).

Plaintiff has not alleged that Fries ever acknowledged or understood that he had a fiduciary relationship to plaintiff regarding the Crawford/Greene transaction. As noted, Fries and plaintiff attended meetings with Crawford/Greene representatives together, and plaintiff had access to all of Fries' corporate financial data. Fries owed no fiduciary duty to plaintiff, so he cannot have breached that duty.

### CONCLUSION

On the facts alleged, I find there is no colorable basis upon which to predict plaintiff could recover against the non-diverse defendants, Skarupa and Fries, for breach of fiduciary duty. Skarupa and Fries, therefore, were fraudulently joined for the purpose of defeating diversity jurisdiction. Plaintiff's claim against Skarupa and Fries for breach of fiduciary duty is dismissed.

Complete diversity now exists in this case, and it may proceed in this court.

**It is, therefore, ordered that:**

1) Plaintiff's motion to remand be, and hereby is, denied; and

2) Count V of plaintiff's complaint be, and hereby is, dismissed.

3) A telephone scheduling conference is set for January 3, 2003 at 4:00 p.m.

**So ordered.**