ESTATE OF SCHROER, APPELLEE, *v.* STAMCO SUPPLY, INC., APPELLANT.

(No. C-830826—Decided September 19, 1984.)

*Keating, Muething & Klekamp* and *Richard L. Creighton,* for appellee.

*Strauss, Troy & Ruehlmann Co., L.P.A.,* and *Charles G. Atkins,* for appellant.

PALMER, J. The instant matter was tried to the trial court on a joint stipulation of facts with exhibits, and resulted in a judgment for the plaintiff-appellee, from which this appeal was taken. The relevant facts which pose the issues in this appeal, raising what appear to be questions of first impression in this state, may be summarized as follows.

The defendant-appellant, Stamco Supply, Inc. ("Stamco"), is an Ohio corporation and, by stipulation, is a "close corporation." Since 1973, Ralph W. Grimme, the chief executive officer of Stamco, and his family members have owned and exercised a controlling influence upon Stamco and have constituted the controlling family group of Stamco.[1] On November 12, 1974, the

---

[1] The present capital structure of Stamco appears to involve two classes of common stock. Class "A" consisting of seventeen hundred forty-five issued shares, $100 par value, entitled to one vote per share, and class "B" consisting of seventeen hundred twenty issued shares, no par value, entitled to four votes per share. Presently, two members of

corporation approved the repurchase of all shares of Stamco stock then held by Agnes Grimme, Ralph W. Grimme's mother, consisting of one hundred eighty shares (class unspecified) at $208.38 per share, the "present book value" of the shares as then determined by resolution of the board of directors. No notice of this purchase was given to the other shareholders. Then, in April 1976, the corporation repurchased all shares of stock then held by Ralph W. Grimme's brother, a member of the Grimme controlling family group, consisting of two hundred sixty-two shares of class "A" stock at $259.37 per share, the then book value as determined by the corporation's certified public accountants. No notice of the repurchase was given to the remaining shareholders. At no time relevant herein was Dorothy K. Schroer either a director or an officer of Stamco.

On September 8, 1980, Dorothy K. Schroer, through counsel, made formal demand on the corporation to repurchase all common shares held by Mrs. Schroer. This offer was declined by the corporation, and resulted in the filing of the instant complaint on October 31, 1980, asking, as relief, that the corporation repurchase the shares held by Mrs. Schroer "on terms as favorable as those given to members of the controlling family group. * * *" Subsequent to the institution of the action, Mrs. Schroer died and the appellee co-executors were substituted in her stead.

After considering the stipulations and the respective arguments and memoranda of counsel, the trial court entered its decision on August 24, 1983, finding for the plaintiff and ordering that the Schroer stock be purchased by Stamco "on the same basis as those shares purchased on November 12, 1974, from Mrs. Agnes M. Grimme,"[2] and in a manner as set forth in its formal judgment entry of October 13, 1983. From this judgment appeal was timely filed, with three numbered assignments of error presented for review, although each is at best an argument addressed to what is essentially a single asserted error, *viz.*, the trial court erred in granting judgment to plaintiff when such judgment was, under the stipulation of facts, contrary to law.

I

First, appellant argues that the 1974 purchase of Agnes Grimme's shares, as well as the 1976 purchase of Ralph W. Grimme's brother's shares, was lawful under Ohio law and the corporation's charter. So much is clear and, indeed, the plaintiff does not contest the issue. R.C. 1701.35 provides, in relevant part:

"(A) A corporation by its directors may purchase shares of any class issued by it, in any of the following instances:

"(1) When the articles authorize the redemption of such shares and do not prohibit such purchase;

"* * *

"(10) When authorized by the articles or by such vote or consent of holders of such proportion of shares,

---

the Grimme family own all seventeen hundred twenty shares of class "B" stock, and four hundred fourteen shares of class "A" stock. The balance of the outstanding class "A" shares are owned by the Hoersting heirs (four hundred thirty-two shares), George R. Wimmer (three hundred sixteen shares), and Dorothy Schroer, appellee's decedent (five hundred eighty-three shares), a total of thirteen hundred thirty-one shares.

[2] The appellee does not contest by cross-appeal or otherwise the selection by the trial court of the November 12, 1974 purchase at $208.38 per share, rather than the later April 1976 purchase at $259.37 per share, or some other figure, as the price at which the corporation must purchase the Schroer shares. The question is not, therefore, at issue in this case.

though less than a majority, of any one or more classes as is provided in the articles.

"(B) A corporation shall not purchase its own shares except as provided in this section, nor shall a corporation purchase or redeem its own shares if immediately thereafter its assets would be less than its liabilities plus stated capital, or if the corporation is insolvent, or if there is reasonable ground to believe that by such purchase or redemption it would be rendered insolvent."

Since the stipulated financial records of the corporation demonstrate no inhibition arising from R.C. 1701.35(B) above, and since the fifth of the articles of incorporation of Stamco expressly authorizes such purchase — "*Fifth* — the corporation may purchase, hold, sell, transfer and reissue any of its shares, of any class, at any time and from time to time and may issue shares of stock to shareholders as a stock dividend, and to the extent that the authority to do the same may be granted under these Articles, the Board of Directors shall have the power to do all of said acts without any action of the shareholders, * * *" — there is no question that can arise concerning the corporation's authority, upon authorization by its board of directors, to have made the two purchases of stock from members of the controlling group.

Moreover, argues the defendant corporation, there is no commandment of the Ohio general corporation law, R.C. Chapter 1701, requiring a similar offer to purchase shares of non-controlling stockholders as an accompaniment to the purchase of shares from a controlling member. Nor, adds the defendant, has there been to date any common-law contribution to the direct question by Ohio courts. Thus, concludes the defendant, it was error for the trial court to nevertheless find the existence of a fiduciary duty between the shareholders of Stamco which was violated by the refusal of the majority to cause the corporation to repurchase plaintiff's minority shares on terms as advantageous as those offered its own members. Alternately, the defendant argues that if such fiduciary duty is held to exist, it lies between the majority and minority shareholders, the former of whom should thus have been the parties defendant, rather than the corporation.

These summarize Stamco's arguments in its first two assignments of error. Finding no merit in them, we overrule both.

## II

As noted at the outset of this decision, Stamco is, by stipulation, a "close corporation," a phrase which by now may be said to have assumed status as a phrase of art, replacing less inclusive and perhaps misleading alternates like "closed corporations" or "closely held corporations." See 1 O'Neal, Close Corporations (2 Ed. 1971), Section 1.04.[3] A close corporation is characterized, perhaps always, by at least two indicia: first, a relatively small number of shareholders as compared to a publicly held corporation, and, second, one whose shares are not traded on a national securities exchange or regularly quoted on an over-the-counter market, and are only rarely bought and sold. In addition to these universals, it is frequently characterized by an identity of management and ownership, see Rohrlich, Organizing Corporate and Other Business Enterprises (4 Ed. 1967), Section 4.19, by restrictions on the free

---

[3] It is inevitable that Professor O'Neal's scholarship, both in the above invaluable work and other learned exercises, *e.g.,* O'Neal, "Squeeze-outs" of Minority Shareholders, *infra,* figures largely in any discussion of close corporations and problems attendant thereto.

alienability of shares, see Ginsberg, The Need for Special Close Corporation Legislation in Illinois (1975), 25 De Paul L. Rev. 1, 11, and, of most immediate relevance, by its unmistakable resemblance to the partnership form. See *68th Street Apts., Inc.* v. *Lauricella* (Law Div. 1976), 142 N.J. Super. 546, 362 A.2d 78, affirmed (App. Div. 1977), 150 N.J. Super. 47, 374 A.2d 1222; *In re Voluntary Dissolution of Pivot Punch & Die Corp.* (1959), 15 Misc. 2d 713, 182 N.Y.Supp.2d 459, modified, 9 App. Div. 2d 861, 193 N.Y. Supp.2d 34. It has, indeed, been referred to at times as a "chartered partnership," "incorporated partnership," and as "a corporation de jure and a partnership de facto," and other terms descriptive of the participants' usual and customary intention to consider themselves as partners *inter sese* while obtaining the advantages of the corporate form. See 1 O'Neal, *supra,* at 3, Section 1.02, at 21, Section 1.07.

Various codifications of these indicia have been attempted in a number of states, see *id.* at Section 1.02, but not to date in Ohio, although the enactment in 1981 of R.C. 1701.591, authorizing close corporation agreements, may be said by inference to accept the foregoing definitional expressions. Thus, for example, if a close corporation agreement meets the three basic requirements of R.C. 1701.591(A), it may restrict or eliminate the board of directors and delegate director authority to a shareholder, R.C. 1701.591(B)(8), and, in general, comport itself as though it were in fact a partnership. As R.C. 1701.591(E) provides:

"No close corporation agreement is invalid among the parties on any of the following grounds:

"(1) The agreement is an attempt to treat the corporation as if it were a partnership or to arrange their relationships in a manner that would be appropriate only among partners;

"(2) The agreement provides for the conduct of the affairs of a corporation in a manner that would otherwise be inappropriate or unlawful; * * *"

It seems fair to say that by this enactment Ohio has signalled its recognition of the eclectic tendencies of the close corporation in blending features of the corporate and the partnership form, and given compliance with the statutory safeguards, has approved the hybridization. It is also doubtless a tacit recognition of the flexibility inherent in the form, the realization of which, over the past twenty years, has helped to make the close corporation a ubiquitous and indispensable factor in our economic life.

Given the nature of the close corporation, which, while it shares many of the advantages of the publicly held corporation such as limited liability, indefinite life, tax benefits, and so on, may more closely resemble a partnership or individual proprietorship in actual operation, it is not surprising that courts have been called upon to step outside the traditional rules of law that have long governed corporate operation and to borrow from allied disciplines those principles and rules which seem best to comport with the mixed nature of the close corporation form. The leap from one discipline to another has not always been an easy one to make. See Weiner, Legislative Recognition of the Close Corporation (1929), 27 Mich. L. Rev. 273; Conway, The New York Fiduciary Concept in Incorporated Partnerships and Joint Ventures (1961), 30 Fordham L. Rev. 297. Indeed, it is said that nearly all statutory and most innovative case law in the field of close corporations post-dates World War II. See 1 O'Neal, *supra,* at 51, Section 1.13, at 51-52, Section 1.13a.

One such interdisciplinary borrowing is of particular relevance in the instant case. Because of the relatively small number of shareholders involved and the usual intimate relationship be-

tween majority shareholders and the actual operation and direction of the close corporation, the form is peculiarly susceptible to a particular form of misuse or abuse by the majority or controlling shareholders. Commonly known as a "squeeze-out" or "freeze-out," it refers to manipulative use of corporate control to eliminate minority shareholders, or to reduce their share of voting power or percentage of ownership of assets, or otherwise unfairly deprive them of advantages or opportunities to which they are entitled. See O'Neal, "Sqeeze-outs" of Minority Shareholders: Expulsion or Oppression of Business Associates (1975). Instances and methods of squeeze-outs, as reported in the decisions dealing with the problem, are many and varied, and appear limited only by human ingenuity motivated by greed or hope of advantage.

The judicial response provided by these episodes of abuse was to borrow from the law of partnerships the concept that where several owners carry on a business together in the close corporation form, their relationship should be considered a fiduciary one. Notwithstanding corporate statutes and common-law doctrines conferring authority to manage in directors, and authority in defined percentages of assenting shareholders to effect fundamental changes, "this does not mean that the directors or the majority shareholders should be permitted to exercise their powers arbitrarily or without regard to the legitimate expectations of the minority shareholders; and many of the older decisions and practically all of the recent ones indicate that controlling shareholders, in some circumstances at least, owe fiduciary duties to minority shareholders, and that the courts will require them (whether they act in their capacity as shareholders or through directors or officers whom they control) to observe accepted standards of business ethics in transactions affecting rights of minority shareholders." (Footnotes omitted.) 2 O'Neal, Close Corporations, *supra*, at 45, Section 8.07.

The principle has received wide expression in recent cases. See, for example, in neighboring states, *Cressy* v. *Shannon Continental Corp.* (1978), 177 Ind. App. 224, 378 N.E.2d 941, where the court recognized that, with respect to the duty to disclose the availability of stock for purchase, " 'the holders of a closely held stock in a corporation * * * bear a fiduciary duty to deal fairly, honestly, and openly with their fellow stockholders and to make disclosure of all essential information.' " *Id.* at 229, 378 N.E.2d at 945. See, also, *Miller* v. *Magline, Inc.* (1977), 76 Mich. App. 284, 256 N.W.2d 761; *Zahn* v. *Transamerica Corp.* (C.A. 3, 1947), 162 F.2d 36, applying Kentucky law; *Illinois Rockford Corp.* v. *Kulp* (1968), 41 Ill. 2d 215, 242 N.E.2d 228.

One of the clearest expressions of the principle is found in *Alaska Plastics, Inc.* v. *Coppock* (Alaska 1980), 621 P.2d 270, where the court examined and approved the rule of *Donahue* v. *Rodd Electrotype Co.* (1975), 367 Mass. 578, 328 N.E.2d 505 (see *infra*), and *Jones* v. *H. F. Ahmanson & Co.* (1969), 1 Cal. 3d 93, 460 P.2d 464, agreeing with those courts that:

"[T]ransactions by one group of shareholders that enable it to derive some special benefit not shared in common by all shareholders should be subject to close judicial scrutiny. The Massachusetts Supreme Judicial Court concluded that shareholders in closely held corporations owe one another a fiduciary duty. * * * [Quotation and citation omitted.] The California Supreme Court concluded that a controlling group of shareholders owes a similar duty to minority shareholders * * * [so] that a control block of stock could not be used to give the majority benefits that were not shared with the minority.

"We believe that *Donahue* and

*Ahmanson* correctly state the law applicable to the relationship between shareholders in closely held corporations, or between those holding a controlling block of stock, and minority shareholders." *Id.* at 276. See, also, *Wilkes* v. *Springside Nursing Home, Inc.* (1976), 370 Mass. 842, 353 N.E.2d 657; *Hallahan* v. *Haltom Corp.* (1979), 7 Mass. App. 68, 385 N.E.2d 1033; *68th Street Apts.* v. *Lauricella, supra.*

In Ohio, the principle has received somewhat less explicit, although a nevertheless inferable, expression in the area of the authority of corporate directors or majority shareholders to redeem or retire corporate stock. See, *e.g., Manington* v. *Hocking Valley Ry. Co.* (C.P. 1910), 9 Ohio N.P. (N.S.) 641, 679-683. The federal courts, applying what they found to be Ohio law, assume the existence of a fiduciary duty between shareholders of a close corporation and particularly between majority and minority holders. In *United States* v. *Byrum* (1972), 408 U.S. 125, rehearing denied (1972), 409 U.S. 898, Mr. Justice Powell, speaking for the majority in a case involving several Ohio close corporations, noted:

"A majority shareholder has a fiduciary duty not to misuse his power by promoting his personal interests at the expense of corporate interests." *Id.* at 137.

Footnoted at the conclusion of the foregoing is the following notation:

"Such a fiduciary relationship would exist in almost every, if not every, State. Ohio, from which this case arises, is no exception: [Quotation omitted.] 13 Ohio Jur. 2d, Corporations, § 662, pp. 90-91 (footnotes omitted)." *Id.* at 137-138, fn. 11.

In several cases, the precise situation present in the matter *sub judice* was presented for decision, *i.e.,* the redemption or purchase of stock by the majority interest in a close corporation upon terms and conditions not offered or available to minority shareholders. The leading case, and the one followed by the court below, is *Donahue* v. *Rodd Electrotype Co., supra.* After examining the nature of the close corporation, the court held:

"Because of the fundamental resemblance of the close corporation to the partnership, the trust and confidence which are essential to this scale and manner of enterprise, and the inherent danger to minority interests in the close corporation, we hold that stockholders in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another." (Footnotes omitted.) *Id.* at 592-593, 328 N.E.2d at 515.

Addressing the facts of the case, the Massachusetts Supreme Judicial Court then held:

"When the corporation reacquiring its own stock is a close corporation, the purchase is subject to the additional requirement, in the light of our holding in this opinion, that the stockholders, who, as directors or controlling stockholders, caused the corporation to enter the stock purchase agreement, must have acted with the utmost good faith and loyalty to the other stockholders.

"To meet this test, if the stockholder whose shares were purchased was a member of the controlling group, the controlling stockholders must cause the corporation to offer each stockholder an equal opportunity to sell a ratable number of his shares to the corporation at an identical price. Purchase by the corporation confers substantial benefits on the members of the controlling group whose shares were purchased. These benefits are not available to the minority stockholders if the corporation does not also offer them an opportunity to sell their shares. The controlling group may not, consistent with its strict duty to the minority, utilize its control of the corporation to obtain

40

special advantages and disproportionate benefit from its share ownership." *Id.* at 598, 328 N.E.2d at 518.

To similar effect are the cases of *Comolli* v. *Comolli* (1978), 241 Ga. 471, 246 S.E.2d 278; *Tillis* v. *United Parts, Inc.* (Fla. App. 1981), 395 So. 2d 618. See, also, *Connelly* v. *Estate of Dooley* (1981), 96 Ill. App. 3d 1077, 422 N.E.2d 143.

We conclude, therefore, that under the facts stipulated in this case, the Grimme controlling shareholder group owed a fiduciary duty to the minority shareholders, including plaintiff's decedent, substantially akin to that fiduciary duty owed by one partner to another, to deal *inter sese* in the utmost good faith, which duty was breached by the refusal of the majority shareholders to cause the corporation to extend to Mrs. Schroer, as a minority shareholder, the same right to have her stock purchased by the corporation at a price and on terms similar to the offer extended to members of the controlling family group. Moreover, we hold that the defendant corporation against whom relief was properly sought, *Donahue* v. *Rodd Electrotype Co., supra,* and *Comolli* v. *Comolli, supra,* was a necessary and proper party to the action, whatever other alternate parties (and relief) might arguably have been permitted.

### III

The sole remaining question is raised by the appellant's third assignment of error, which argues that the instant lawsuit was commenced beyond the time allowed by the applicable statute of limitations, and that the trial court erred in declining to dismiss the action on such basis. The argument proceeds on the theory that an action for breach of a fiduciary duty is a tort action and governed by the four-year limitation period provided by R.C. 2305.09. Since, argues the defendant, the cause of action accrued not later than April 1976,

when Paul Grimme's stock was purchased, more than four and one-half years transpired before suit was commenced on October 31, 1980. Plaintiff, on the other hand, argues for application of the six-year limitation period of R.C. 2305.07, or the ten-year period provided by R.C. 2305.14. The point is unnecessary to decide.

Under the facts stipulated in this case, no formal notice of the repurchase of Paul A. Grimme's two hundred sixty-two shares in April 1976 was given to the shareholders, including Mrs. Schroer. Plaintiff's complaint asserts that *prior to March 11, 1977,* she was unaware of the repurchase of Paul A. Grimme's stock, or the earlier purchase of Agnes Grimme's stock. There is nothing in the record to controvert this allegation, except defendant's formal denial "for want of knowledge." While we may conclude, therefore, that Mrs. Schroer had knowledge of the repurchase on and after March 11, 1977, we may not assume, having no basis for doing so, that she had knowledge of the repurchase before that date. The cause of action could accrue no earlier than the date she first had notice of the violation of her right to share the benefits of the repurchase; to hold otherwise would obviously reward deceit and concealment. Since October 31, 1980, the date suit was commenced, is well within four years of the date of such presumed first notice, March 11, 1977, it is unnecessary to decide whether the four, six or ten-year limitation period applies. Assuming, *arguendo,* that the defendant is correct in seeking to apply R.C. 2305.09, the action was nevertheless timely commenced. The third assignment of error is overruled.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

SHANNON and BLACK, JJ., concur.