GENSEMER et al., Appellees and Cross–Appellants,

v.

HALLOCK et al., Appellants and Cross–Appellees.

[Cite as *Gensemer v. Hallock* (1997), 125 Ohio App.3d 84.]

Court of Appeals of Ohio,
Ninth District, Medina County.

No. 2626–M.

Decided Dec. 31, 1997.

*James A. Amodio* and *William J. Muniak,* for appellees and cross-appellants.

*Glenn R. Jones* and *Susan L. Funk,* for appellants and cross-appellees.

---

QUILLIN, Judge.

Defendants/appellants, Macy and Clare Hallock, appeal from the judgment of the Medina County Court of Common Pleas finding that Macy Hallock breached his fiduciary duty to plaintiffs/appellees, and denying the counterclaim that plaintiffs/appellees breached such a duty to them. Plaintiffs/appellees, Richard and Paula Gensemer, cross-appeal from the judgment denying their claims for additional damages. We affirm.

In the early 1960s, appellants Hallock, appellees Gensemer, and another individual, Mel Gerspacher, jointly purchased several parcels of commercial real estate with the intended purpose of leasing it to other businesses. They incorporated their enterprise under the name GerHalGen, Inc., and proceeded to function under this ownership arrangement for approximately ten years. In the early 1970s, Gerspacher's shares were purchased by the corporation and GerHal-Gen, Inc. continued to operate with Macy and Clare Hallock and Richard and Paula Gensemer each owning one-quarter of the stock. Although the corporation was formally dissolved in 1988, its assets were equally distributed to the four shareholders and the business continued to operate.

It appears that at the inception of the business relationship, Mel Gerspacher was primarily responsible for the administration and management of the business and Paula Gensemer was responsible for handling the financial records, daily books, and business expenses. Once Gerspacher was bought out, Macy Hallock assumed many of his responsibilities, including insurance coverage for the GerHalGen properties. Richard Gensemer apparently handled various miscella-

neous tasks relating to the upkeep of the properties. Clare Hallock never actively participated in the management of the business.

In 1983, anticipating his future retirement, Macy Hallock began to turn over some of his managerial responsibilities to Medina Management Company ("MMC"), which was a property management company owned and operated by his son, Alan Hallock. MMC gradually began to take over the day-to-day operational management and maintenance of the GerHalGen properties, and it billed GerHalGen for the services provided and expenses incurred.

In approximately 1992, the Gensemers began to suspect MMC's billing practices. They also began to retroactively question the insurance premiums submitted to and paid by GerHalGen subsequent to Gerspacher's departure. The relationship between the Gensemers and the Hallocks began to dissolve. In approximately January 1993, GerHalGen ceased to use MMC's services and Richard Gensemer began to manage the properties himself. (By this time, the Hallocks were spending a good portion of the year residing in Florida.)

In May 1993, the Gensemers filed an action for partition of the GerHalGen properties. This action eventually resulted in a December 1994 sheriff's sale, at which the Gensemers were the successful bidders. The properties were thereafter transferred to them as individuals in January 1995, and the GerHalGen entity was thereby dissolved. In June 1993, the Gensemers filed the current action against the Hallocks in the Medina County Court of Common Pleas. The Hallocks filed several counterclaims. Many of the claims asserted were settled prior to trial. Of those remaining, the lower court found that Macy Hallock had breached his fiduciary duty with regard to the insurance charges and awarded the Gensemers damages for excessive payments. The court denied all other claims and counterclaims. The Hallocks appeal this decision, assigning two errors, the first of which is subdivided into three parts. The Gensemers cross-appeal, also assigning two errors. We will begin with the Hallocks' appeal.

"I.   The court of common pleas erred in finding that defendant Macy Hallock, Sr. breached a fiduciary duty to the plaintiffs and as a result incurred an overpayment on behalf of the business entity identified as GerHalGen in the amount of $64,776.83.

"A.   Did defendant Macy Hallock, Sr., breach a fiduciary duty owed to the plaintiffs as a result of their business relationships in the entities known as GerHalGen, Inc. and GerHalGen with regard to the purchase of certain insurance policies?"

It is clear that during the years of its incorporation, GerHalGen, Inc. operated as a close corporation, as its shares were not traded on a securities market and ownership was limited to a small number of people who were dependent on each

other for the business to succeed. See *Crosby v. Beam* (1989), 47 Ohio St.3d 105, 107–108, 548 N.E.2d 217, 219–220. Because close corporations bear a striking resemblance to partnerships, Ohio courts have borrowed from the law of partnerships and determined that shareholders in a close corporation owe substantially the same fiduciary duty to one another as do members of a partnership. *Estate of Schroer v. Stamco Supply, Inc.* (1984), 19 Ohio App.3d 34, 38, 19 OBR 100, 104–105, 482 N.E.2d 975, 979–980. That fiduciary duty has been described as " 'impos[ing] on the members of the firm the obligation of the utmost good faith in their dealings with one another with respect to partnership affairs, of acting for the common benefit of all the partners in all transactions relating to the firm business, and of refraining from taking any advantage of one another by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind.' " *Lorain Natl. Bank v. Saratoga Apts.* (1989), 61 Ohio App.3d 127, 130–131, 572 N.E.2d 198, 200, quoting 68 Corpus Juris Secundum (1988), 516–517, Partnership, Section 76.

Although the legal corporation dissolved in 1988, the Hallocks admit that the professional relationship continued as an "informal partnership," and the lower court referred to Macy Hallock as "a partner, in effect, of the Gensemers." While the postcorporation era has been referred to by the parties and the lower court as a joint venture, it would appear that this was not a joint venture. A joint venture has been defined as an association of persons intending to carry out "a single business adventure." *Ford v. McCue* (1955), 163 Ohio St. 498, 56 O.O. 410, 127 N.E.2d 209, paragraph one of the syllabus. Here, it is clear that the parties intended to engage in an ongoing business, rather than a single transaction. See *Domo v. Stouffer* (1989), 64 Ohio App.3d 43, 49, 580 N.E.2d 788, 791–792. It appears, therefore, that the basic business relationship changed little, if at all, in the years following the corporate dissolution, and that the fiduciary responsibility between the parties remained the same as well.

As mentioned above, once Gerspacher ceased to be involved in the corporation, Macy Hallock assumed many of his responsibilities. Among these was the responsibility of obtaining insurance coverage for the properties. In addition to the GerHalGen properties, the Hallock family had commercial real estate of their own. Soon after taking over the insurance for GerHalGen, Macy Hallock decided to package the Hallock properties and the GerHalGen properties and insure them under one policy. He informed the Gensemers that by doing so, GerHalGen would save a considerable amount of money on their premiums. This packaged arrangement continued until 1992, when Richard Gensemer, questioning the premiums GerHalGen had been paying, subsequently purchased insurance for the GerHalGen properties at a significantly lower rate.

At trial, the Gensemers presented the expert testimony of Larry Marshall. Marshall testified at length regarding his twenty-seven years of commercial insurance experience and the method by which he arrived at his opinion in this case, and concluded that, in his expert opinion, due to the packaging of the GerHalGen and Hallock properties, over the course of approximately twelve years GerHalGen had unnecessarily overpaid $64,776.83 in insurance premiums. The Hallocks presented no expert testimony contrary to that of Marshall. Instead, they argue on appeal that the Gensemers were fully aware from the beginning that the properties were being packaged for insurance purposes and that they had full knowledge of the premiums GerHalGen was paying, as it was Paula Gensemer, who cut the checks. The Hallocks contend, therefore, that the Gensemers had plenty of opportunity to protest the insurance arrangement if they objected to it. The Hallocks also argue that the insurance purchased by Macy Hallock provided better, more comprehensive coverage than that later acquired by Richard Gensemer. Marshall's testimony indicated, however, that the additional coverages provided by Macy Hallock's package deal inured primarily, if not solely, to the benefit of the Hallock properties.

The questions of the appropriateness of the insurance coverage and the amount of overpayment, if any, are essentially weight-of-the-evidence questions. The law in Ohio is clear that if a judgment is supported by some competent, credible evidence as to all the essential elements of a case, a reviewing court should not reverse the judgment as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.

In this case, there was extensive expert testimony concluding that, due to its properties' being packaged with the Hallock properties, GerHalGen was overcharged and billed for insurance coverage it did not need. There was no expert testimony to the contrary. The lower court expressly found Marshall's testimony credible. The court also found that due to the partnership relationship among the four parties, the Gensemers trusted Macy Hallock to handle the insurance with their best interests in mind and that Macy Hallock was aware of their trust. The court concluded that Macy Hallock breached his fiduciary duty to the Gensemers by billing GerHalGen for insurance coverage that unduly inured to the Hallocks' benefit. We believe there is competent, credible evidence in the record to support this conclusion and find no basis on which to reverse it.

"B. Did the court err in awarding damages to the plaintiffs for insurance payments made during the existence of the corporation since plaintiffs failed to bring their cause of action as a shareholders derivative action?"

As discussed above, the lower court found that, as a result of Macy Hallock's breach of fiduciary duty, GerHalGen overpaid a total of $64,776.83 in insurance premiums during the years 1980 through 1992. Because the Gensemers owned one-half the business, the lower court awarded them damages of $32,388.42, or one-half the overpayment. The Hallocks argue, however, that because the business was incorporated during the years 1980 through 1988, the Gensemers could not, as individuals, recover damages for these years, as any loss sustained was sustained by the corporation rather than by the Gensemers.

It is true that where a defendant's wrongdoing results in damage to a corporation, the cause of action accrues to the corporation rather than to its individual shareholders. *Adair v. Wozniak* (1986), 23 Ohio St.3d 174, 178, 23 OBR 339, 342, 492 N.E.2d 426, 429. While a shareholder may bring a derivative action under Civ.R. 23.1 on behalf of the corporation, the shareholder generally does not have a direct cause of action unless injured in some way separate and distinct from any injury to the corporation. *Crosby, supra*, 47 Ohio St.3d at 107, 548 N.E.2d at 219–220. It seems clear, on the facts of this case, that the overpayment of insurance premiums between the years 1980 and 1988 was an injury sustained by GerHalGen, Inc., and not by the Gensemers personally.

However, the Ohio Supreme Court has carved out an exception to the normally distinct separation between derivative and direct actions. The court has stated that "[c]laims of breach of fiduciary duty alleged by minority shareholders against shareholders who control a majority of shares in a close corporation * * * may be brought as individual or direct actions and are not subject to the provisions of Civ.R. 23.1." *Crosby, id.* at paragraph three of the syllabus. The logic behind this exception is that if a minority shareholder in a close corporation were required to institute a derivative rather than a direct action, "then any recovery would accrue to the corporation and remain under the control of the very parties who are defendants in the litigation." *Id.* at 109, 548 N.E.2d at 221. However, while *Crosby* clearly recognizes the special circumstances of close corporations, it is not directly applicable to the case at bar, as there are no majority or minority shareholders involved here. In this case, Macy and Clare Hallock owned fifty percent of the corporate stock, as did Richard and Paula Gensemer. Presumably, had monetary damages been awarded directly to the corporation, the Gensemers would have had as much right and opportunity to exercise control over the award as the Hallocks.

In *Citizens Fed. Bank v. Chateau Constr. Co., Inc.* (Jan. 19, 1994), Montgomery App. No. 13902, unreported, 1994 WL 12488, one Ohio appellate court allowed a shareholder in a close corporation to bring a direct action despite the fact that there was equal ownership between the plaintiff and the defendant. The court allowed the direct action in that case because the defendant was the "controlling

shareholder," actively participating in the day-to-day operation of the business, with him and his wife "handl[ing] the books, records, and bank account." *Id.* In this case, while it appears that Macy Hallock (and later, Alan Hallock) exercised primary control over the management of the company, it was undisputed that Paula Gensemer handled the corporate finances and that Richard Gensemer did participate in the daily affairs of the business, albeit to a lesser extent. Therefore, *Citizens Fed. Bank* is not entirely applicable either.

Although neither of the foregoing cases is directly on point with the current case, we nonetheless find them persuasive. Here, the corporation was dissolved years before the damage was discovered. This court has already affirmed the lower court's finding that damage resulted from the actions of Macy Hallock both before and after corporate dissolution. To require the Gensemers now to pursue a derivative action for the years preceding dissolution would seem a considerable waste of judicial resources. The issues in either case would be identical. In a situation such as this, then, where there is a close corporation with only four shareholders, where the corporation has already been dissolved, and where the issues involved are not terribly complex, we cannot say the lower court errs in allowing a former shareholder to pursue a direct action against another former shareholder.

We become further convinced of the propriety of allowing this case to proceed as a direct action when we examine the policy behind the distinction between derivative and direct actions. One important reason for requiring shareholders to bring derivative actions in most situations is to avoid the multiplicity of direct actions that would encumber the courts if every shareholder were allowed to maintain his own, separate action. *Weston v. Weston Paper & Mfg. Co.* (May 11, 1994), Montgomery App. No. 13815, unreported, 1994 WL 179940. On the other hand, shareholders in close corporations are not always required to bring derivative actions, because allowing their actions to proceed directly will not lead to the same, overwhelming number of claims. *Id.* This is particularly true in this case, where the only two shareholders who would seek to bring this action have done so by filing as coplaintiffs. We therefore conclude that the lower court did not err in awarding the Gensemers damages in their direct action to recover overpayments incurred during the years of GerHalGen's incorporation.

"C. Is the plaintiff's claim for damages resulting from the purchase of certain insurance policies and the court's finding that defendant breached his fiduciary duties barred by laches, estoppel, ratification or other equitable defense?"

Under this section of the Hallocks' first assignment of error, they again argue that the Gensemers knew or should have known of the insurance arrangement and that they should have expressed any objection to it long ago. The Hallocks point out that the Gensemers were aware from the beginning that

GerHalGen's properties would be packaged with the Hallock properties for insurance purposes. They point out that Paula Gensemer faithfully paid the annual insurance premium on GerHalGen's behalf, without ever questioning the amount or type of coverage. The Hallocks claim that by these actions, the Gensemers "not only knew of the conduct, but condoned and agreed to the conduct." They argue that the twelve-year delay in bringing this lawsuit amounts to waiver, laches, estoppel, and ratification of Macy Hallock's action.

Whether or not the Gensemers had prior notice or knowledge of the negative effect of Macy Hallock's insurance arrangement is, again, a weight-of-the-evidence question. The lower court found that the Gensemers did not have such prior notice or knowledge, and thereby implicitly ruled against the Hallocks on these affirmative defenses. The lower court wrote:

"The parties were good friends, trusting each other and not foreseeing any trouble when GerHalGen was first formed. * * * Because of this trust and friendship, the Gensemers did not question or examine the activities of Macy Hallock in managing the properties * * *.

"* * *

"* * * Macy Hallock was a partner, in effect, of the Gensemers. He was someone upon whom they felt justified in relying, and Mr. Hallock knew this. Mr. Hallock owed the Gensemers a fiduciary duty to obtain the best possible coverage."

We have previously discussed the various business responsibilities of each party and the fiduciary duty that each owed to the other. Given the nature of the business relationship and its close resemblance to a partnership, we find that there was competent, credible evidence to support the lower court's finding that the Gensemers justifiably relied on Macy Hallock's representation that his insurance arrangement was in GerHalGen's best interest. Due to this reliance, it was reasonable to conclude that the Gensemers were not previously aware of the detriment of Macy Hallock's actions, and, therefore, the lower court did not err in refusing to grant judgment to the Hallocks on the basis of their affirmative defenses. The Hallocks' first assignment of error is overruled.

"II. The court of common pleas erred in finding that there was no violation of any fiduciary duty on the part of the plaintiffs, most particularly with regard to financial expenditures authorized and made by them on behalf of the business entity identified as GerHalGen, subsequent to the purchase of the business entity's property at sheriff sale, by the plaintiffs, and prior to the transfer of said property to them as individuals."

As indicated in the facts above, the Gensemers filed a partition action in May 1993. From approximately January of that year until the December 1994

sheriff's sale, Richard Gensemer maintained almost exclusive control over the management of GerHalGen's properties. The Hallocks argue in their second assignment of error that the Gensemers breached their fiduciary duty to the Hallocks in the way the property was managed during this time. We have broken down this assignment for ease of discussion.

## A. Leasing the Premises

In early 1993, GerHalGen's largest individual rental space was vacated. The previous tenant had paid $3,590 in monthly rent. In February, Macy Hallock notified Richard Gensemer through a letter that Alan Hallock had located a potential tenant for this space. Prior to identifying this tenant, however, Alan Hallock sought to negotiate a leasing fee. Richard Gensemer testified that he replied to this notification with a letter seeking further information. Nevertheless, the rental space thereafter stood empty for approximately six months and was subsequently leased to another tenant for a monthly rent of $2,607. The Hallocks argue that the Gensemers' failure to pursue Alan Hallock's potential tenant and the subsequent rental at a lower monthly rate resulted in a loss of income to the company and was, therefore, a breach of fiduciary duty.

We are unpersuaded by the Hallocks' argument here. First, there was a factual dispute at trial as to who "dropped the ball" on this negotiation, Richard Gensemer or Alan Hallock. Second, there was no clear evidence presented as to when or if Alan Hallock's potential tenant would be available to take possession. The premises may well have stood empty for six months even if Richard Gensemer had pursued this option. Third, although Richard Gensemer had essentially begun managing the property on his own, Macy Hallock was still an equal owner of the business and did, in fact, sign several leases with other tenants during this time. There is no evidence that he could not have pursued this option with Alan Hallock himself if he had been concerned about business profits. Fourth, there was no evidence that the business lost money simply because the new tenant took possession at a lower monthly rent than had been paid by the previous tenant. Trial testimony indicated that the new commercial tenant agreed to make improvements to the property at its own expense. Paula Gensemer testified that the cost of these improvements totaled approximately $25,000. There is, therefore, no evidence that the company suffered for accepting a lower monthly rent in exchange for these renovations. We cannot say that the lower court erred in refusing to find a breach of fiduciary duty here.

## B. Improvements to the Property

Also during the time that Richard Gensemer was managing the property, several expenditures were made by GerHalGen to effect various improvements to the property. One such improvement was a new roof on one of the buildings.

The others were "build-out" projects, particularly the Manpower, Inc. build-out, which essentially renovated the rental units in order to suit the needs and specifications of incoming tenants. The Hallocks argue that these improvements came after the sheriff's sale in December 1994 but prior to the property's being transferred to the Gensemers in January 1995, thereby creating a cost to GerHalGen from which only the Gensemers would benefit.

While the Hallocks argue that the expenditures authorized by the Gensemers inured only to the Gensemers' benefit, the Hallocks presented no evidence that the expenditures were not necessary at the time they were made. Testimony indicated that the roof in question had long been in need of repair and that extensive patching had already been done. Richard Gensemer testified that the roof was replaced in January 1995 because replacement had become necessary and this was the first time the weather warmed to a point where the work could be accomplished. In addition, the build-outs were done in an effort to meet the needs of future tenants, primarily Manpower, Inc. Paula Gensemer identified letters at trial which detailed the work that GerHalGen agreed to do on Manpower's behalf prior to it taking occupancy. These letters predated the December 1994 sheriff's sale, thereby suggesting that the Gensemers were not merely acting in their own self-interest when they agreed to make the improvements, contrary to the Hallocks' assertion.

The lower court found that the Gensemers "appear to have made reasonable efforts to keep the property rented and for its upkeep during the partition action." Without evidence to suggest that the Gensemers' efforts were not reasonable, this court can find no reversible error in the lower court's determination. The Hallocks' second assignment of error is overruled.

The Hallocks also argue in their reply brief that the improvements to the property gave the Gensemers an unfair advantage in bidding at the sheriff's sale. They argue that the Gensemers had, at the time of the sale, made the decision to make the improvements, thereby giving them an unfair advantage in estimating the worth of and in bidding on the property. (Apparently the Gensemers and the Hallocks were the only bidders at the sale.) The Hallocks did not raise this specific argument in their counterclaim or in the lower court and it does not appear that the lower court addressed it. We decline, therefore, the invitation to consider the issue here. See *Shover v. Cordis Corp.* (1991), 61 Ohio St.3d 213, 220, 574 N.E.2d 457, 462–463.

We now address the Gensemers' cross-appeal.

"I.  The trial court erred in failing to award Gensemer damages equal to one-half of the deficiency in security deposits conveyed to Gensemer after the property transferred to Gensemer."

██ Following the sheriff's sale of the GerHalGen properties, the lower court apparently ordered that the successful bidders, the Gensemers, should receive the sum of $12,129.50, which was the total security deposits received from the current tenants. However, after the property transferred, the Gensemers received only $5,559.67. Because the money was originally paid to GerHalGen and the Hallocks were half owners of the business, the Gensemers claim that the Hallocks are responsible for half the shortfall, or $3,284.77. The lower court disagreed, finding that there was "insufficient evidence to determine that any of the Defendants were responsible for any shortfall." The Gensemers claim that this finding was against the manifest weight of the evidence.

The Gensemers have failed to furnish this court with a copy of the court order by which they claim their entitlement to the security deposits. Production of that document was relevant to the Gensemers' claim here, and may have provided this court with insight that we do not now possess. In its absence, we have only the testimony and the trial court's findings on which to base an opinion.

At trial, Paula Gensemer testified that the security deposit funds were deposited in an escrow account. At the time the funds were to be paid to the purchaser of the property, there was a shortfall of over fifty percent. The lower court denied the Gensemers' claim on the basis of insufficient evidence to suggest that the Hallocks were responsible for the deficiency. The Gensemers claim that this finding was against the manifest weight of the evidence. This finding was not against the manifest weight of the evidence, as there was no evidence to suggest that the Hallocks were responsible. While there was also no direct evidence to suggest that the Gensemers were responsible, the Gensemers had been running the business, essentially independently, for two years. Without further explanation for the shortfall, we cannot say the lower court erred in refusing to hold the Hallocks accountable for the missing funds. The Gensemers' first assignment of error is overruled.

"II. The trial court erred in failing to award Gensemer damages for the lost rents sustained as a result of Macy Hallock's second lease with FM Systems."

██ Some time after Richard Gensemer assumed the management responsibilities in January 1993, he notified one of the current tenants, FM Systems, whose lease was about to expire, that he would be requiring a rent increase upon renewal. Richard Gensemer testified that the rent increase was necessary due to FM Systems' excessive utility costs. FM Systems was owned and operated by one of Macy and Clare Hallock's sons. Subsequent to the notification of rent increase, FM Systems' lease was renewed, unbeknownst to the Gensemers, at a rate of $1,350 per month, an amount which did not reflect the increase. The renewed lease was signed by Macy Hallock on behalf of GerHalGen. Apparently, FM Systems continued in possession for a year following this renewal, after

which the Gensemers rented to a new tenant for $1,800 per month (although the term of this subsequent lease was only one month). The Gensemers allege that the business lost money due to Macy Hallock's renewing this lease at below market value, and that they are entitled to one-half the value of the rents lost, or $2,700.

In the lower court's judgment entry, the court simply indicated that it found for the Hallocks on all other counts (excluding the judgment regarding the insurance premiums, discussed above) in the Gensemers' complaint. The court never mentioned this claim for lost rents in its findings of fact; therefore, we do not know on what basis the claim was denied. We again perceive this to be a weight-of-the-evidence question, however, and proceed under the standard of some competent, credible evidence, as discussed above.

At trial, Richard Gensemer testified that the rent increase was necessary due to the high utility costs for the premises rented by FM Systems. Macy Hallock testified, however, that the request for an increase came at a time when the property was not renting well. He indicated that the alternative to renewing the lease at the current rate was to lose FM Systems as a tenant and that if FM Systems vacated, the building would stand approximately three-quarters vacant. He further testified that at that time, under GerHalGen's circumstances, it was difficult to bring in new tenants and that for this reason, he believed it to be in GerHalGen's best interests to renew the lease at the current rate rather than lose it.

We find that Macy Hallock's testimony constitutes some competent, credible evidence that he did not breach his fiduciary duty in renewing the lease with FM Systems. We can find no reversible error in the lower court's refusal to award lost rents to the Gensemers on this basis. The Gensemers' second assignment of error is overruled.

Having found no reversible error in the decision of the lower court in this case, we find that neither the appeal nor the cross-appeal is well taken. The judgment of the lower court is affirmed.

*Judgment affirmed.*

DICKINSON, P.J., concurs.

BAIRD, J., dissents in part.

BAIRD, Judge, dissenting in part.

What sort of injury could have been experienced by the plaintiffs in this case? It seems to me that the only way that they could have been hurt would have been

for the value of their corporate shares to have diminished, or for the amount available for dividends on their corporate shares to have been reduced. This is, of course, another way of saying that the harm, if any, was to the corporation, and that any detriment to the plaintiffs as individuals was in their capacity as shareholders and did not exceed the detriment to every other shareholder similarly situated. See *Schwartz v. Rice* (May 19, 1997), Stark App. No. 96CA0348, unreported.

In *Weston v. Weston Paper & Mfg.* (1996), 74 Ohio St.3d 377, 379, 658 N.E.2d 1058, 1060–1061, the court reaffirmed the principle that, before a shareholder may bring a direct action, he must suffer a separate and distinct harm. No such showing has been made here. Moreover, though I do not agree with the theory that the absence of qualification for the maintenance of a derivative suit under Civ.R. 23.1 is of crucial significance,[1] I believe that the disqualification mentioned by the majority would not exist here. If it did, derivative actions could never be maintained between equal or unequal shareholders because the claimant shareholder could not represent the interests of the wrongdoer shareholder.

I dissent as to the ability of the plaintiffs to recover for the period of time the corporation existed. I concur in the balance of the majority opinion.

---

**1.** It is interesting also to note that *Weston* reached its result even though the court recognized that the shareholder would not qualify, under the requirements of Civ.R. 23.1, for the maintenance of a derivative action.