OPINION
Plaintiff-appellant, Cathy R. Quesnell ("Quesnell"), appeals from the May 11, 2001 judgment of the Franklin County Court of Common Pleas in favor of appellee, Bank One Corporation ("Bank One"), on her claim of unjust enrichment, and the November 2, 2000 entry granting summary judgment in favor of Bank One on her breach of contract claims. For the reasons that follow, we affirm in part, reverse in part, and remand for a determination as to damages.
In 1997, Bank One conducted an internal audit of its cemetery and funeral trust product and found numerous problems with the product. On April 22, 1997, Bank One posted an internal job posting for a newly created position for a Client Services Officer ("CSO") to focus on a national perspective for the product and to serve as a single point of contact for two large cemetery and funeral trust clients, Service Corporation International ("SCI"), and Loewen Group ("Loewen"). The position was posted as a salary grade level 10. Within Bank One the title "Client Services Officer" was later changed to that of "Relationship Manager."
Quesnell had been working for Bank One from March 1992 until July 1997 in the corporate trust division. Quesnell, who had prior experience in the death care industry, applied for and received the new position on June 9, 1997. Quesnell reported to Verlin Horn ("Horn"). Horn expected Quesnell to perform in the position as both a relationship manager and a product manager. As a relationship manager, Quesnell was responsible for managing the SCI and Loewen client relationships and developing opportunities to increase revenue for Bank One. As a product manager, Quesnell was expected to assist in evaluating an overall strategy for cemetery trust related business, evaluate regulatory requirements, and to assist with standardizing and cleaning up the cemetery and funeral trust product. Bank One wanted to ensure compliance with applicable laws, and to minimize its risk exposure. As a product manager, Quesnell was also responsible for managing the profitability of the product.
Relationship managers were compensated by a base salary and an incentive plan that paid them quarterly based on a percentage of projected fees on new business they brought into the bank. Product managers also were compensated by a salary and an incentive plan, but product managers' incentives were calculated under a different formula based on the pretax earnings of the department as a whole. Product manager incentives were paid out only at the end of the year. A product manager had to be employed and in good standing with Bank One at the end of the year to receive incentive pay.
Employees at Bank One could be informed of their particular incentive compensation plan in a number of different ways. According to Kelly Crissinger, a human resource consultant with Bank One, the typical way in which managers, including Quesnell's manager for the first part of 1998, Michael Daniel, distributed the plans to the people they managed was by preparing a communication or memo and attaching it to the plan itself, acknowledging their participation in a particular plan for the year. The 1998 Relationship Manager Incentive Compensation Plan contained a paragraph that said:
 This Plan may be modified, amended or terminated at any time by the Banc One Investment Management Group. The existence of the Plan does not obligate the Banc One Investment Management Group to pay an award to any participant (or beneficiary) nor does the participant (or beneficiary) attain any vested right to forfeit an award until the award has been finalized and approved for payment. [Defendant's exhibit No. R.]
Quesnell's previous position had been a salary grade level 7, and she was also participating in the CSO incentive plan for 1997. Because Bank One's internal policies did not permit a three grade pay increase, Quesnell was hired into the newly created position at a salary grade level 9, with the provision that her performance would be reviewed in six months. If her performance was satisfactory and she had expanded her role to include product manager activities, her salary would be increased to level 10. The terms of the six-month review were memorialized in a June 9, 1997 memorandum from Horn to Quesnell. The memo did not mention that the change to salary grade level 10 would also result in a change in Quesnell's job title.
Quesnell did not remember Horn telling her about the relationship manager incentive package in their initial conversation, but they talked about it subsequently, and he told her it would be the CSO/relationship manager program, one and the same. Throughout 1997, Quesnell was compensated as a relationship manager under the 1997 incentive plan she had been operating under in the corporate trust division.
In October 1997, Michael Daniel ("Daniel") assumed Verlin Horn's responsibilities, and Quesnell began reporting to Daniel. In early March or February 1998, Daniel reviewed Quesnell's performance, changed her job title to that of product manager, and changed her salary grade to a level 10. Daniel was pleased with the way Quesnell was performing the relationship manager aspect of her job, but thought that she was lagging behind somewhat in terms of her product manager duties. Daniel did not eliminate or reduce any of Quesnell's relationship manager responsibilities, but wanted her to focus more on the product manager aspects of her position. Quesnell was still expected to bring in additional assets to the bank. At the meeting with Daniel in which he changed her title to product manager, Daniel did not tell Quesnell that her incentive plan would change. But neither did he provide her with a copy of the 1998 relationship manager incentive plan and tell her that she was going to be compensated under that plan. As a result of being moved to a salary grade level 10, Quesnell received an $8,000 raise, which brought her annual salary to $53,000.
Quesnell understood that her role was to evolve from that of a relationship manager to that of a product manager. She and Daniel discussed a proposal in which additional relationship managers would be hired to work with SCI and Loewen and Quesnell would be the national product manager overseeing the product and monitoring the industry. The plan was to be fully implemented in July 1998. At that time, Quesnell would take over as national product manager and be compensated accordingly. Quesnell testified that Daniel told her that she was covered under the 1998 Relationship Manager Plan and would be compensated as a relationship manager, but that would change in the future when a new relationship manager had been hired to take over the SCI relationship. Although Daniel never formally presented Quesnell with a copy of the 1998 Relationship Manager Incentive Plan, he recalled that he may have given her a copy of the plan in relation to her responsibility to hire additional CSO/relationship managers. According to Quesnell's testimony, Daniel told her that she would continue on as a relationship manager until the new relationship managers were hired to take over the SCI and Loewen relationships.
The plan to hire additional relationship managers never came to fruition. Shortly after Quesnell's evaluation, Daniel's job duties were restructured, and he was no longer responsible for the cemetery and funeral trust product. In April 1998, Frank Green ("Green") became Quesnell's manager and assumed responsibility for the product. Cemetery and funeral trusts were a small part of his overall responsibility. Shortly after becoming involved with the product, Green decided that it was in the best interest of Bank One to exit the cemetery and funeral trust business. Bank One management responded by forming a committee, and the committee decided to keep offering the product.
At the time Green became Quesnell's supervisor, he knew that she was acting in the role of both relationship manager and product manager. However, Green did not have an understanding of Quesnell's compensation package, and he did not discuss Quesnell's compensation package with Michael Daniel when he first took over. Sometime in April, Quesnell asked Green to provide her with the 1998 incentive plan. Also in April, John Noel, Bank One's Finance Manager for the Institutional Sales Group, circulated an e-mail concerning potentially large payouts to Quesnell under the 1998 Relationship Manager Incentive Plan. The April 16, 1998 e-mail provided, in pertinent part:
 Jeff, per our discussion yesterday I have put together the attached spreadsheet showing the impact of the change in the RM Incentive plan for 1998 vs 1997 for two accounts (SCI Loewen).
 If the $10,000 cap was in place we would only pay Cathy Quesnell an additional $7,279 for both the SCI Loewen accounts (the SCI account would have total referral payments of $20k with $10k going to Eric Plangman). However, the 1998 incentive plan does not mention a $10k cap and because of the size of the additions it would put Cathy in the 15% incentive category for all of her referrals. I have listed sales YTD ($252,233) along with projections for Loewen of $800,000 ($400,000 very likely to occur 2nd quarter). If all of this happens we have the potential to pay Cathy $157k (or $150k more than we would have paid her under the 1997 plan).
My concerns are:
1) is this the intent of the plan.
 2) even thought [sic] Cathy is listed as the referral and has worked with Alan Westcott in closing these deals should she get referral credit? Alan has had both of these accounts long before Cathy was involved and more than likely would have closed them with or without her.
 Since we will be submitting all payments to compensation by the 27th of April in order for the incentives to be paid on May 15th, I will need some sort of resolution on this in the next week.
 Call me when you have a chance to discuss. [Plaintiff's exhibit No. 5.]
Michael Daniel received the Noel e-mail and forwarded it to Frank Green. Green then contacted Daniel to tell him that he was going to put Quesnell under the product manager plan, and Daniel said that sounded fine to him. Daniel relayed to Green that he felt that Quesnell was functioning as a product manager, and she should receive a product manager's compensation. Green did not recall Daniel ever relating that he had told Quesnell that she was going to be compensated under the relationship manager plan.
On May 22, 1998, Quesnell wrote an e-mail to Green requesting an in-person meeting to discuss her compensation plan. In the e-mail, Quesnell states, "I am a full time Relationship Manager." (Plaintiff's exhibit No. 15.) Green responded by e-mail that same day, stating that he did not have time to meet with her in the next week but that her primary role was that of product manager, and that he did not agree that she was currently operating as a full-time relationship manager. Id. He further stated that he hoped "we can address this issue in the next few weeks." Id.
On May 25, 1998, Quesnell again e-mailed Green requesting a meeting to discuss her roles and compensation plan. In her e-mail, Quesnell stated in part:
 * * * I have always been compensated as a Relationship Manager under the sales incentive plan. If you read my file, you will see that I am not compensated as a Product Manager and will not be until July 1 as determined by Mike Daniel. The only change is that I have taken on product management responsibilities in addition to RM responsibilities. [Defendant's exhibit No. E.]
On May 26, 1998, Green responded by e-mail stating in pertinent part:
 Your title is Director of Product Management. You have responsibilities for Product Management along with additional responsibilities for Relationship Management. Your incentive plan will reflect that. Up to this point, it clearly has been your responsibility to develop the product for Cemetery and Funeral Trusts. That is reflected in your title. That has been your primary responsibility. Your base compensation is an entirely different issue vs your incentives.
 The structure of your incentive plan for 1998 will be determined in the near future. I am planning on reviewing this with you at that point. Id.
Green testified that he had discussed Quesnell's compensation package with her several times, but she continued to relate confusion about her role. In May 1998, Green began the process of drafting a 1998 incentive plan for Quesnell. That process was never completed before Quesnell was terminated.
On July 27, 1998, Quesnell again e-mailed Green to request an in-person meeting to obtain clarification about her role. On July 29, 1998, Green responded that he was quite concerned about her continued confusion about her role, and that he would be happy to meet with her on August 7, 1998. At that meeting, Green terminated Quesnell. Green testified that he terminated Quesnell for reasons related to continuing problems with the product and problems getting information from her. Quesnell received three months severance pay upon her termination.
On June 23, 1999, Quesnell filed suit, alleging, inter alia, breach of a written contract, breach of an oral contract, and unjust enrichment. On November 3, 2000, the trial court granted summary judgment in favor of Bank One on the contract claims, finding that the 1998 Relationship Manager Incentive Plan gave Bank One the unlimited right to determine the nature or extent of its performance. As such, any promise to pay incentives under a written contract was illusory. The trial court found that any oral contract that was created by virtue of statements by Horn and Daniel was still subject to the written terms of the Relationship Manager Incentive Plan and was also illusory. The trial court denied summary judgment with respect to the claim for unjust enrichment, and that claim proceeded to a bench trial.
On May 11, 2000, the trial court entered findings of fact and conclusions of law with respect to the unjust enrichment claim. The trial court concluded that Quesnell clearly conferred a benefit upon Bank One as a result of the accounts she brought in, and that Bank One knew of the benefit, in fact, at one point, commended Quesnell for bringing in assets of over $48 million. The trial court further concluded, however, that Bank One's retention of the benefit was not unjust under the circumstances because Quesnell was adequately compensated by her salary and severance pay, and that she should not have expected to participate in the Relationship Manager Incentive Program for 1998 since she was never formally presented with the plan.
Quesnell appealed the judgment in favor of Bank One and has assigned the following as error:
 1. The Trial Court erred when it concluded that Bank One had not been unjustly enriched, despite finding that Bank One had been enriched by the plaintiff, that Bank One had knowledge of the benefit it had received, and that it did not pay Ms. Quesnell commissions for the sales she generated.
 2. The Trial Court erred when it granted defendant Bank One's motion for summary judgment on plaintiff's claim for breach of a written and/or oral contract and denied plaintiff's cross-motion for partial summary judgment.
 3. The Trial Court erred as a matter of law when it ruled that the Bank One Relationship Manager Plan was an unenforceable illusory contract.
 4. The Trial Court erred as a matter of law when it ruled that any oral agreement between the parties was an unenforceable illusory contract.
In her first assignment of error, Quesnell does not take issue with the trial court determining that she had conferred a benefit upon Bank One by bringing in new accounts worth nearly $100 million. Quesnell does not take issue with the trial court determining that Bank One was well aware of the benefit it was receiving. Rather, Quesnell takes issue with the trial court's conclusion that failing to pay her any incentives was not unjust under the circumstances. Appellant argues that after she secured new business, Bank One retroactively declared her ineligible to receive incentive pay.
A claim for unjust enrichment rests upon the equitable principle that one shall not be permitted to unjustly enrich oneself at the expense of another without making compensation therefor. National City Bank v. Fleming (1981), 2 Ohio App.3d 50, 57. In Hummel v. Hummel (1938),133 Ohio St. 520, 525, the Supreme Court of Ohio observed that liability in quasi-contract "`arises out of the obligation cast by law upon a person in receipt of benefits which he is not justly entitled to retain.'" In order to recover under a theory of unjust enrichment or quasi-contract, a plaintiff must prove by a preponderance of the evidence: (1) the plaintiff conferred a benefit upon defendant; (2) defendant had knowledge of such benefit; and (3) for him to retain that benefit under circumstances where it would be unjust for him to retain that benefit without payment. Hambleton v. R.G. Barry Corp. (1984),12 Ohio St.3d 179, 183; and Dixon v. Smith (1997), 119 Ohio App.3d 308,317-318.
The trial court's rationale that Quesnell was adequately compensated for the benefit she conferred by virtue of her salary and the pay increases she received is not supported by the evidence in the record. Under the manifest weight of the evidence standard in a civil case, the reviewing court must determine from the record if the judgment is supported by some competent, credible evidence going to all essential elements of the case. C. E. Morris Co. v. Foley Constr. Co. (1978),54 Ohio St.2d 279, syllabus.
Here, Quesnell's own supervisor, Frank Green, drew a sharp distinction between Quesnell's salary or base compensation and her incentive pay. In the May 26, 1998 e-mail in which Green informed Quesnell that her incentive plan for 1998 would be determined in the near future, Green wrote: "Your base compensation is an entirely different issue vs your incentives." (Defendant's exhibit No. E.) The Horn memorandum made it clear that the only purpose of the six-month review was to raise Quesnell to a pay salary grade level 10 (as the position was originally posted) if her performance was satisfactory. The memorandum made clear that Quesnell was expected to continue performing her dual role of relationship manager and product manager and to expand her product manager duties. From the outset of her employment in cemetery and funeral trusts, Quesnell was told by Horn that she was participating in the CSO/Relationship Manager Incentive Program. Until Frank Green became her manager, Quesnell was never told that she was no longer eligible to participate in the Relationship Manager Incentive Program. Finally, all of Quesnell's managers indicated that Quesnell was to receive incentives on top of her base pay for her relationship manager achievements. Verlin Horn discussed Quesnell's participation in the CSO/Relationship Manager Incentive Plan in 1997. According to Quesnell's testimony, Mike Daniel told her she would be covered under the 1998 Relationship Manager Plan until additional relationship managers were hired to take over the two large clients. Frank Green communicated that Quesnell would receive a discretionary bonus in addition to her product manager incentive pay to reflect her relationship manager accomplishments. Thus, the trial court's rationale for finding that Bank One was not unjustly enriched because Quesnell was adequately compensated by her salary is against the manifest weight of the evidence.
The trial court's other rationale for finding no unjust enrichment was that Quesnell could have had no expectation that she was eligible to participate in the Relationship Manager Incentive Program because she had never been formally presented with the plan by her manager. Again, the evidence at trial does not support this conclusion. Throughout her tenure in cemetery and funeral trusts, Quesnell was in a unique role. It was expected that she would perform both as a relationship manager and as a product manager. In 1997, Quesnell was compensated as a relationship manager. At the meeting in which her title changed to product manager, her relationship manager duties were not reduced and Daniel did not tell her that her incentive plan would change.
According to Quesnell's testimony, she and Daniel discussed the need to hire additional relationship managers who would eventually assume her relationship manager duties:
 Q. DID MR. DANIEL EVER TELL YOU THAT AS A RESULT OF THAT TITLE [PRODUCT MANAGER] YOU WOULD NO LONGER RECEIVE INCENTIVE PAY AS A RELATIONSHIP MANAGER?
A. NO.
Q. WHAT DID HE TELL YOU?
 A. HE TOLD ME THAT I WOULD CONTINUE ON UNTIL WE HIRED RELATIONSHIP MANAGERS TO MANAGE THE SCI AND LOEWEN RELATIONSHIPS WHEN WE [IMPLEMENTED] THE PLAN. [Transcript II at 30-31.]
Bank One's own exhibit reflects this same understanding. Frank Green never responded to the portion of Quesnell's e-mail in which she stated:
 I have and continue to be a full time Relationship Manager with, for a variety of reasons, two very difficult clients. I have always been compensated as a Relationship Manager under the sales incentive plan. If you read my file, you will see that I am not compensated as a Product Manager and will not be until July 1 as determined by Mike Daniel. * * * [Defendant's exhibit No. E.]
On redirect examination, Quesnell reiterated that Mike Daniel told her she was to be covered under the relationship manager plan in 1998:
 Q. WAS THERE SOME OTHER REASON YOU THOUGHT YOU WERE COVERED UNDER THAT PLAN IN 1998?
A. YES.
Q. WHAT WAS THE REASON FOR THAT?
A. MIKE DANIEL TOLD ME I WAS.
THE COURT: I MISSED THAT?
 THE WITNESS: MIKE DANIEL TOLD ME THAT I WAS. [Tr. II at 75-76.]
Bank One attempts to minimize the impact of this evidence by saying the court did not find Quesnell credible, but nowhere in the trial court's findings of fact does the trial court comment on Quesnell's credibility.[1] The trial court's finding that at no time in 1998 did Quesnell's supervisor inform her that she was eligible to participate in the 1998 Relationship Manager Incentive Plan is directly contrary to the testimony and evidence presented at trial. Mike Daniel did not go through the formal step of giving Quesnell a copy of the 1998 plan and telling her that she would be operating under that plan. But at no point in the trial did anyone testify that it had to be done in that manner.[2]
Kelly Crissinger stated that it could be done in a number of ways:
 Q. OKAY. AND HOW ARE EMPLOYEES AT BANK ONE INFORMED OF THE TERMS OF THIS PARTICULAR PLAN?
 A. IT CAN BE DONE ON A NUMBER OF DIFFERENT WAYS. I WOULD SAY THAT GENERALLY WHAT OCCURS IS A MANAGER WILL PREPARE SOME TYPE OF A COMMUNICATION TO THE GROUP THAT MAY SAY ATTACHED YOU WILL FIND YOUR 1998 INCENTIVE PLAN, AND IT WILL BE ACCOMPANIED BY THE ACTUAL INCENTIVE PLAN ITSELF, AS WELL AS PERHAPS A TARGET INCENTIVE PAY OUT. [Tr. II at 115-116.]
Crissinger's testimony does not establish that a formal conference in which the employee is presented with the written plan is the only way an employee becomes eligible to participate in an incentive plan. The trial court found that an employee is not eligible to participate until notified by his or her manager. However, Quesnell was notified by her manager Mike Daniel that she was to be compensated under the Relationship Manager Incentive Plan until new relationship managers were hired to take over the function Quesnell had been performing. In fact, Quesnell was notified by all of her managers that she would be recognized for her relationship manager contributions.
Quesnell continued to perform her duties as a relationship manager and bring in new business to Bank One throughout her tenure in cemetery and funeral trusts. It was not until May 1998, after he received the Noel e-mail and the knowledge of potentially large payouts, did Frank Green unequivocally notify Quesnell that she would be ineligible for relationship manager incentives for the entire year of 1998. This is the essence of an unjust enrichment claim. The trial court's conclusion that retention of this benefit by Bank One without payment is not unjust under these circumstances is contrary to the manifest weight of the evidence and the law of unjust enrichment. Until May 26, 1998, Quesnell had every reason to anticipate receiving incentive payments for her services as a relationship manager because payment was promised to her. It is unjust under these circumstances for Bank One to withhold payment.
Accordingly, the first assignment of error is sustained in part and overrule in part, and the matter is remanded to the trial court for a determination of assets and fees Quesnell brought into Bank One and the amount of compensation Quesnell is entitled to from January 1, 1998 until May 26, 1998.
In her remaining assignments of error, Quesnell challenges the trial court's determination that any written or oral contracts between Quesnell and Bank One were illusory and hence unenforceable.
As to Quesnell's contention that summary judgment was improperly granted, Civ.R. 56(C) states that summary judgment shall be rendered forthwith if:
 * * * [T]he pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * *
Accordingly, summary judgment is appropriate only where: (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. Tokles Son, Inc. v. Midwestern Indemn. Co. (1992),65 Ohio St.3d 621, 629, citing Harless v. Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64, 65-66. "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record * * * which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." Dresher v. Burt (1996), 75 Ohio St.3d 280, 292. Once the moving party meets its initial burden, the nonmovant must then produce competent evidence showing that there is a genuine issue for trial. Id. Summary judgment is a procedural device to terminate litigation, so it must be awarded cautiously with any doubts resolved in favor of the nonmoving party. Murphy v. Reynoldsburg (1992),65 Ohio St.3d 356, 358-359.
Appellate review of summary judgments is de novo. Koos v. Cent. Ohio Cellular, Inc. (1994), 94 Ohio App.3d 579, 588; Midwest Specialties, Inc. v. Firestone Tire Rubber Co. (1988), 42 Ohio App.3d 6, 8. We stand in the shoes of the trial court and conduct an independent review of the record.
In its decision granting summary judgment for Bank One on the contract claims, the trial court recognized that: "[A] contract is illusory only when by its terms the promisor retains an unlimited right to determine the nature or extent of his performance; the unlimited right, in effect, destroys his promise and thus makes it merely illusory." Century 21 v. McIntyre (1980), 68 Ohio App.2d 126, 129-130. Here, the contract in question is unquestionably one-sided in favor of Bank One. Under its terms, the 1998 Relationship Manager Incentive Compensation Plan contained a paragraph that said:
 A) This Plan may be modified, amended or terminated at any time by the Banc One Investment Management Group. The existence of the Plan does not obligate the Banc One Investment Management Group to pay an award to any participant (or beneficiary) nor does the participant (or beneficiary) attain any vested right to forfeit an award until the award has been finalized and approved for payment. [Defendant's exhibit No. R; emphasis added.]
We agree with the trial court that the foregoing language provided Bank One with an unlimited right to determine the nature or the extent of its performance. As such, the oral promise of Mike Daniel, that as long as Quesnell remained a relationship manager she would be eligible under the relationship manager program, is merely illusory because such a promise incorporates the Relationship Manager Incentive Plan that gives Bank One the unlimited right to withhold payment. Thus, the trial court was correct in finding that Quesnell's claims under a contract theory must fail, and that she was only left with her unjust enrichment claim. Accordingly, the remaining assignments of error are not well-taken and are overruled.
Based on the foregoing, we sustain in part and overrule in part Quesnell's first assignment of error. The second, third, and fourth assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.
Judgment affirmed in part, reversed in part, and remanded for further proceedings.
DESHLER and BROWN, JJ., concur.
[1] Bank One posits another reason that the trial court did not believe Quesnell: that she never presented any of this evidence at the summary judgment stage of the proceedings. We have reviewed Quesnell's deposition and find that she clearly testified that Mike Daniel told her that, as long as she continued to serve as a relationship manager, she would be eligible under the relationship manager program. (Quesnell Depo., at 36-37.) This testimony is consistent with her trial testimony.
[2] At the summary judgment stage, Bank One presented the affidavit of Frank Green in which he stated, "At Bank One, incentive plans are revised annually. For each calendar year, an employee is not eligible to participate in any incentive plan until he or she is officially notified by his or her manager of the plan in which the employee will be participating for that calendar year." Neither Green nor any other witness so testified at the trial in this matter.